**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

GLOBAL REACH, INC.,

Plaintiff,

v.

HAWKWOOD GROUP LLC, and ROBERT KENT,

Defendants.

**Case No.:** 1:26-cv-01394

**PLAINTIFF GLOBAL REACH, INC.'S OPPOSITION**
**TO DEFENDANT KENT'S MOTION TO DISMISS**

Plaintiff Global Reach, Inc. ("Global Reach" or "Plaintiff"), by and through its attorneys, hereby submits this Opposition to Defendant Robert Kent's ("Defendant" or "Kent") Motion to Dismiss and purported Amended Motion to Dismiss (ECF Nos. 16, 19) ("Motion to Dismiss" or "MTD" or "Motions") Plaintiff's Complaint (ECF No. 1) ("Complaint").

## TABLE OF CONTENTS


TABLE OF AUTHORITIES ..... iii

I. INTRODUCTION ..... 1

II. BACKGROUND ..... 1

A. Global Reach Is Retained to Help Bring Mr. Nuñez Home ..... 2

B. Hawkwood and Kent Begin Their Interference with Global Reach's Efforts ..... 4

C. Hawkwood and Kent Escalate Their Interference ..... 7

D. Hawkwood Blocks Global Reach's Recent Efforts to Repatriate Mr. Nuñez ..... 12

III. STANDARD OF REVIEW ..... 14

IV. ARGUMENT ..... 15

A. Global Reach Has Established Personal Jurisdiction over Defendant Kent ..... 16

1. Jurisdiction over Defendants Is Authorized Under the Long Arm Statute ..... 16

2. Defendants Have Sufficient Minimum Contacts with Washington, D.C. ..... 20

3. Global Reach Satisfies the Modern *Calder* Effects Test ..... 26

B. Venue Is Proper in the District of Columbia ..... 28

C. Global Reach Has Stated a Tortious Interference Claim ..... 29

1. Global Reach Has a Valid Business Relationship with Mr. Nuñez's Fiancée. ..... 29

2. Defendants Had Knowledge of and Interfered with Global Reach's Charitable Business Relationship ..... 31

3. Global Reach Has Been Harmed as a Result of Defendants' Interference ..... 32

4. Defendant Kent Has Not Established His Interference Was Legally Justified or Privileged ..... 33

V. CONCLUSION ..... 34

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*180 E. Broad Partners LLC v. Ohio Dep't of Tax'n*,
193 F. Supp. 3d 1 (D.D.C. 2014)........................................................................ 19

*Akhmetshin v. Browder*,
275 A.3d 290 (D.C. 2022)........................................................................ 17, 19

*Alpine Consulting Partners, LLC v. Jacokes*,
No. CV 25-913 (SLS), 2025 WL 2959574 (D.D.C. Oct. 17, 2025).......................... 27

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)........................................................................ 14

*Bowhead Info. Tech. Servs., LLC. v. Catapult Tech. Ltd.*,
377 F. Supp. 2d 166 (D.D.C. 2005)........................................................................ 31

*Calder v. Jones*,
465 U.S. 783 (1984)........................................................................ 26, 27

*Carr v. Brown*,
395 A.2d 79 (D.C. 1978)........................................................................ 29

*Cent. Freight Lines Inc. v. APA Transp. Corp.*,
322 F.3d 376 (5th Cir. 2003)........................................................................ 21

*Companhia Brasileira Carbureto De Calcio v. Applied Indus. Materials Corp.*,
35 A.3d 1127 (D.C. 2012)........................................................................ 22

*Crane v. Carr*,
814 F.2d 758 (D.C. Cir. 1987)........................................................................ 15, 28

*Daimler AG v. Bauman*,
571 U.S. 117 (2014)........................................................................ 19

*Does 1-9 v. Dep't of Just.*,
No. 25-CV-325 (JMC), 2025 WL 894120 (D.D.C. Mar. 22, 2025)........................ 15, 28

*Elemary v. Philipp Holzmann AG*,
533 F. Supp. 2d 116 (D.D.C. 2008)........................................................................ 17, 21, 32

*Etchebarne-Bourdin v. Radice*,
982 A.2d 752 (D.C. 2009)........................................................................ 17

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024)........................................................................ 26

*Finca Santa Elena, Inc. v. U.S. Army Corps of Eng'rs*,
873 F.Supp.2d 363 (D.D.C. 2012)........................................................................ 14

*Fletcher v. Doig*,
125 F. Supp. 3d 697 (N.D. Ill. 2014)........................................................................ 21

*Frida Kahlo Corp. v. Pinedo*,
No. 24-10293, 2026 WL 1045144 (11th Cir. Apr. 17, 2026) ..... 27

*Green v. U.S. Dep't of Just.*,
392 F. Supp. 3d 68 (D.D.C. 2019) ..... 14

*GTE New Media Servs. Inc. v. BellSouth Corp.*,
199 F.3d 1343 (D.C. Cir. 2000) ..... 15, 28

*Gustave-Schmidt v. Chao*,
226 F. Supp. 2d 191 (D.D.C. 2002) ..... 14

*Havilah Real Prop. Servs., LLC v. VLK, LLC*,
108 A.3d 334 (D.C. 2015) ..... 29, 33

*Hobson v. Green Fin. Auth.*,
No. CV 26-531 (JDB), 2026 WL 880014 (D.D.C. Mar. 31, 2026) ..... 15

*IMAPizza, LLC v. At Pizza Ltd.*,
334 F. Supp. 3d 95 (D.D.C. 2018) ..... 15

*Johnson v. Griffin*,
85 F.4th 429 (6th Cir. 2023) ..... 27

*Keeton v. Hustler Mag., Inc.*,
465 U.S. 770 (1984) ..... 20

*Kowal v. MCI Commc'ns Corp.*,
16 F.3d 1271 (D.C. Cir. 1994) ..... 14

*LeSEA, Inc. v. LeSEA Broad. Corp.*,
379 F. Supp. 3d 732 (N.D. Ind. 2019) ..... 29

*Liberty Leather Corp. v. Callum*,
653 F.2d 694 (1st Cir. 1981) ..... 31

*Majumdar v. Fair*,
567 F. Supp. 3d 901 (N.D. Ill. 2021) ..... 25

*Media Matters for Am. v. Paxton*,
138 F.4th 563 (D.C. Cir. 2025) ..... 16, 20, 26

*Mouzavires v. Baxter*,
434 A.2d 988 (D.C. 1981) ..... 16

*Mwani v. bin Laden*,
417 F.3d 1 (D.C. Cir. 2005) ..... 15

*Onyeoziri v. Spivok*,
44 A.3d 279 (D.C. 2012) ..... 33

*Overseas Partners, Inc. v. PROGEN Musavirlik*,
15 F.Supp.2d 47 (D.D.C. 1998) ..... 16

*Peek v. Clear Sky Fin., LLC*,
No. CV 24-3125 (RC), 2024 WL 4932059 (D.D.C. Dec. 2, 2024) ..... 19

*Robo-Team NA, Inc. v. Endeavor Robotics*,
313 F. Supp. 3d 19 (D.D.C. 2018)........................................................................ 22

*Rowland v. Cal. Men's Colony*,
506 U.S. 194 (1993) ......................................................................................... 19

*Schwartz v. CDI Japan, Ltd.*,
938 F. Supp. 1 (D.D.C. 1996).............................................................................. 16

*Vantage Commodities Fin. Servs. I, LLC v. Willis Ltd.*,
531 F. Supp. 3d 153 (D.D.C. 2021).................................................................. 33, 34

*Weiser L. Firm, P.C. v. Hartleib*,
No. 23-1889, 2024 WL 5219737 (3d Cir. Dec. 26, 2024)......................................... 27

*World–Wide Volkswagen Corp. v. Woodson*,
444 U.S. 286, 297 (1980) .................................................................................. 20

*Zaidan v. Trump*,
317 F. Supp. 3d 8 (D.D.C. 2018)......................................................................... 14

**Statutes**

28 U.S.C. § 1332.................................................................................................. 15

28 U.S.C. § 1391.................................................................................................. 28

D.C. Code § 13-423 ........................................................................... 16, 17, 18, 19

**Other Authorities**

Restatement (Second) of Torts § 774A.................................................................. 33

## I. INTRODUCTION

Fabio Nicolas Espinal Nuñez ("Mr. Nuñez") should be home right now. After he was detained in a Guinean prison, his family engaged Plaintiff Global Reach, Inc. ("Global Reach") instead of the Defendants to help him get home, and he was set to be released on or around April 17, 2026. But he is not home today because those Defendants, the Hawkwood Group LLC ("Hawkwood" or the "Hawkwood Group") and Robert Kent, interfered, threatened him, and interjected themselves into the Guinean court case where Mr. Nuñez is a defendant. To make things worse, Defendants are mounting a press campaign for another detainee, Bradley Schlenker, that has angered the Guinean authorities, falsely defamed Mr. Nuñez, and prompted the authorities to appeal the order that was set to release both of them.

One defendant, Robert Kent, submitted to the Court, *pro se*, a Motion to Dismiss and purported Amended Motion to Dismiss (ECF Nos. 16, 19) and for the reasons stated herein, in addition to the pertinent arguments and materials provided in the previous filings, that motion should be denied.

## II. BACKGROUND

Mr. Nuñez has been wrongfully detained in Guinea since December 30, 2025.[1] He had responded to an advertisement to co-pilot a Gulfstream airplane from Suriname to Dubai. The plane landed in Conakry, Guinea to refuel. Although the plane had approval to land, everyone on the plane was arrested by the Guinean authorities for allegedly not having the proper permit to do so. That included Mr. Nuñez, Mr. Schlenker (the U.S. pilot), and Kelton Reis (a Brazilian national that had hired the pilots and was the passenger with his family). Compl. ¶¶ 25-29.

---

[1] Global Reach strongly believes that Schlenker, although not its client, is also being wrongfully detained and should also be allowed to legally return home to the U.S. immediately.

### A. Global Reach Is Retained to Help Bring Mr. Nuñez Home

Mr. Nuñez is a dual U.S./Dominican Republic citizen residing in New Jersey and was hired to co-pilot a Gulfstream plane from Suriname to the UAE by Reis. Mr. Nuñez had never met Reis before, had limited contact with Reis ahead of the flight, and had no reasonable indication that any illegality was even potentially involved. On December 30, 2025, Mr. Nuñez, Mr. Schlenker, and Reis were detained in Conakry, Guinea, after landing there to refuel. First Ramsey Decl. ¶ 13 (ECF No. 2-6 at 4). They were arrested because they supposedly did not have the proper landing permits or permissions, despite having an approved flight plan. *Id.* ¶ 15. Initially, on or around January 4, 2026, the pilots' families retained the legal services of Guinean attorney Jean-Baptiste Jocamey Haba ("Haba") as local defense counsel for both Mr. Nuñez and Mr. Schlenker. *Id.* ¶ 17.

On or around February 18, 2026, Global Reach was first brought into this matter by Mr. Schlenker's family. *Id.* ¶ 18.; Compl. ¶ 31. Per its operating procedures, Global Reach conducted multiple screening intake calls with the Mr. Schlenker family, including Mr. Schlenker's four siblings. *Id.* ¶ 32. Global Reach, based on its screening, determined that Mr. Schlenker (like Mr. Nuñez) was being wrongfully detained in Guinea, and that Mr. Schlenker (like Mr. Nuñez) was not involved in any wrongdoing. Nothing that has occurred since changes that belief about Mr. Schlenker.

However, on or about March 2, 2026, Global Reach learned that one of Mr. Schlenker's brothers had hired the Hawkwood Group and confirmed that retention in the days thereafter. *Id.* ¶ 33. Global Reach requires its clients to allow Global Reach to lead all recovery missions. First Ramsey Decl. ¶ 20 (ECF No. 2-6 at 5). This is not for vanity or prestige but, rather, for necessity, so that there is one consistent voice and approach in bringing home a detainee. *Id.* Global Reach thus informed Mr. Schlenker's family that they would be unable to take on Mr. Schlenker's case. Again, this decision was not based on Global Reach's screening but, rather, Global Reach

withdrew from the Mr. Schlenker matter entirely based on the family's independent decision to retain another entity, Hawkwood. Global Reach has been retained solely by Mr. Nuñez's fiancée, and Global Reach effectively ceased substantive communications with Mr. Schlenker's family once it determined that Hawkwood would be responsible for those efforts. Compl. ¶ 34.

On March 10, 2026, Mr. Nuñez's family reached out to Global Reach, not knowing that Mr. Schlenker's family had previously done so. Compl. ¶ 35. Mr. Nuñez's family went through the standard intake process and Global Reach (as it did with Mr. Schlenker) determined that Mr. Nuñez was being wrongfully detained and had not committed any illegalities. *Id.* ¶ 36. During this process, there was expressed concern regarding the Hawkwood Group and its plan to get Mr. Nuñez and Mr. Schlenker out of the country. First Ramsey Decl. ¶ 22 (ECF No. 2-6 at 5). Global Reach thus laid out its own "Theory of Return" for Mr. Nuñez, which would only use legal channels and be *pro bono*.

On March 14, 2026, the pilots were released from prison on bail and placed under a form of home confinement at the Onomo Hotel in Conakry. *Id.* ¶ 16 (ECF No. 2-6 at 4). Following his release from prison, Mr. Nuñez was immediately placed in direct contact with Global Reach via his family, and he has been in contact with Global Reach since that time. Compl. ¶ 37. Mr. Nuñez agreed to Global Reach's methods, which would follow all laws and not put at risk his pilot's license or future ability to travel internationally. Global Reach also established contact with the U.S. Embassy in Conakry to begin a dialogue in an effort to help Mr. Nuñez depart Guinea. First Ramsey Decl. ¶ 23 (ECF No. 2-6 at 6).

On March 16, 2026, Global Reach advised Mr. Nuñez's fiancéethat it would accept the case and she would be the recognized client. Compl. ¶ 41. Since then, Global Reach has been in

consistent, sustained engagement with the Guinean and U.S. authorities to help secure Mr. Nuñez's release. Compl. ¶¶ 42-44.

### B. Hawkwood and Kent Begin Their Interference with Global Reach's Efforts

Defendants operate on an entirely different business model than the nonprofit Global Reach, effectively seeking to earn money at a time when the victims are most vulnerable. Hawkwood advertises a variety of investigative operations, including personnel recovery, kidnap and ransom negotiations, recovery from unlawful state detention. But unlike Global Reach, Hawkwood does this for a hefty fee. Defendants, facing significant financial distress, have taken their pay-to-release model to the extreme by pressuring and threatening Mr. Nuñez to retain them and then needlessly attacking Mr. Nuñez and Global Reach after he did not, thereby interfering with Global Reach's lawful relationship serving its client (Mr. Nuñez's fiancé) that would already have been successful in bringing Mr. Nuñez home absent Defendants' actions. Defendants have also taken on multiple clients in this matter with conflicting interests, and have allowed those conflicts to drive actions that have injured Global Reach and its client.

Hawkwood's self-identified agent is Defendant Robert "Bob" Kent, who purports to be a former U.S. Air Force intelligence officer. Kent has described himself publicly as a "research consultant" with business interests in the Middle East.[2] Hawkwood is owned by Rolando Lopez

[2] Kent has a checkered past. He was reportedly involved with an extortion attempt of former Congressman Matt Gaetz. *See, e.g.*, "Key figure in Gaetz extortion claims responds," Chris Cuomo interview of Bob Kent, CNN (Apr. 6, 2021) (showing Kent admitting that he was cooperating with an FBI investigation into the extortion of Gaetz's family and admitting, at 2:25, that he contacted Gaetz's father and sought $25 million in exchange for "a plan that can make [Matt Gaetz's] future legal and political problems go away.") (available at https://www.cnn.com/videos/politics/2021/04/06/bob-kent-matt-gaetz-allegations-respond-sot-cpt-vpx.cnn) (last visited Apr. 23, 2026).

Escobar, a former FBI agent, who founded Hawkwood in 2019 after serving in a number of private sector security roles. Compl. ¶¶ 16-21.

Hawkwood and Lopez are in apparent financial distress, owing nearly $570,000 in four federal tax liens filed in Denton County, Texas, between December 2024 and November 2025. Compl. ¶ 21; Exs. 10-13. Both are also cited (with others) as debtors on two active UCC secured financing statements filed in Texas in September 2023-January 2024. Compl. ¶ 18; Exs. 14-15. Hawkwood Group LLC's license to perform private investigation and guard services in Texas, license number C24085901, expired on August 31, 2025, and its insurance policy expired on October 13, 2025. Compl. ¶ 17; Exs. 8-9. While this strained financial situation is not central to the underlying issues, Hawkwood's lack of funding provides a motive for its hyper-aggressive (and tortious) sales techniques as well as its interference with the work of Global Reach, a perceived non-profit competitor.

Unfortunately, the Guinean situation described herein is not the first time Global Reach has encountered Defendants. Global Reach was retained previously to aid in the release of Elizabeth Tsurkov of Princeton University, who was kidnapped in Iraq in March 2023 and held for 903 days. First Ramsey Decl. ¶ 56 (ECF No. 2-4 at 14-15). In November 2023, Defendants attempted to contact Ms. Tsurkov's family, making demonstrably false claims that they could secure Ms. Tsurkov's return and were in direct contact with Ms. Tsurkov's kidnappers. *Id.* Hawkwood's interference with Global Reach's client, much like any false claim made to families with loved ones in captivity, introduced unnecessary confusion, stress, and distraction into the mission to return the individual to their loved ones. *Id.* Global Reach did not file legal claims then, as Defendants were—unlike here—not yet seriously jeopardizing Global Reach's efforts to bring a wrongfully detained person home. *Id.*

This time, Hawkwood and Kent are interfering with Global Reach, with real consequences to the efforts to obtain Mr. Nuñez's return home. Kent has repeatedly contacted Mr. Nuñez and used high pressure tactics to pressure Mr. Nuñez to pay and go along with their plan. This included a March 16 discussion between Mr. Nuñez and Kent. Global Reach's Kieran Ramsey and Stacia George were able to overhear when Mr. Nuñez turned his phone on speakerphone to allow Global Reach to listen to it. During his call with Mr. Nuñez, Kent claimed that:

- The situation was rife with corruption, implying that Haba (Mr. Nuñez's Guinean attorney) was somehow complicit in widespread Guinean corruption.
- The total price to pay Hawkwood for his release was originally $1,000,000, but that Kent was able to negotiate the price to $200,000 ($160,000 for Hawkwood's fee, plus $40,000 for the Guineans).
- Mr. Schlenker's family and Reis had each already paid money and Mr. Nuñez should take advantage of the groundwork that had been laid.
- The Hawkwood Group had secured agreements from senior Guinean government officials to return everyone's passports and allow them to depart the country lawfully.
- The charges against Mr. Nuñez and Mr. Schlenker had already been dropped and that they had been detained for this long because Guinean government officials wanted funds from the families.

Compl. ¶¶ 46-52; First Ramsey Decl. ¶¶ 30-31 (ECF No. 2-4 at 7); George Decl. ¶ 11 (ECF No. 2-5 at 3). Kent went on to claim that Mr. Nuñez and Mr. Schlenker would get their passports back the next day (March 17), and that the two would be able to leave the country on March 18—provided, of course, Mr. Nuñez paid the fee to Hawkwood. First Ramsey Decl. ¶ 32 (ECF No. 2-4 at 7); Compl. ¶ 53.

Global Reach tried to avoid issues with Hawkwood, recognizing that it was in everyone's interest to stay in their respective lanes. To that end, Global Reach promptly reached out to Hawkwood on March 16. Global Reach's Ramsey sent a number of text messages to those at Hawkwood, offering to have a discussion to find a path forward. First Ramsey Decl. ¶ 34 (ECF No. 2-4 at 8).

Later on March 16, a Hawkwood representative named "Holt" contacted Ramsey and told him that Global Reach should "stand down." Compl. ¶¶ 55-59; First Ramsey Decl. ¶¶ 34, 35 (ECF No. 2-4 at 8-9). The Hawkwood representative stated that Mr. Nuñez needed to stop listening to his attorneys and go along with "Hawkwood Group's plan" to leave Guinea. First Ramsey Decl. ¶ 35 (ECF No. 2-4 at 8). The Hawkwood representative further explained that Mr. Schlenker's family contacted the Hawkwood Group through an unidentified venture capitalist and that Hawkwood took on the case because of Mr. Schlenker's family connections. *Id.*

The Hawkwood representative also made statements that threatened Mr. Nuñez. The representative claimed that that Hawkwood Group had information that Mr. Nuñez was complicit in the alleged theft of the Gulfstream, while Mr. Schlenker was just gullible. *Id.* These outrageous claims are false; as detailed above, Mr. Nuñez knew very little about the plane or its passengers aside from the logistical necessities incumbent in agreeing to be the co-pilot. Indeed, he had limited contact with the Reis family aside from piloting the plane. The conversation ended with the Hawkwood Representative stating Global Reach should "stand down" on any further effort for 24 hours, followed by a string of negative comments about Global Reach's leadership. Compl. ¶ 59.

### C. Hawkwood and Kent Escalate Their Interference

Unable to secure Mr. Nuñez's agreement to pay Hawkwood, Defendants escalated their pressure tactics, the most serious of which are identified below.

Extortionist Letter. On March 19, 2026, Mr. Nuñez's Dominican Republic counsel sent Mr. Nuñez a letter written in Portuguese that was signed by Kent, who had texted the letter to the wife of Kelton Reis (the Brazilian national who hired Mr. Nuñez and Mr. Schlenker to fly the plane). Compl. ¶¶ 60-63.

Kent contended that the Guinean authorities were engaged in a corrupt scheme to extort wealthy visitors. According to Kent, he alone could secure everyone's release and was actually in control of passports for all that were in detention:

> You [Ms. Reis] will purchase international tickets as directed so that your family can return to your home country.
>
> Bradley Scott Schlenker and Fabio Nicolas Espinal Nuñez will receive their passports and legal clearance from Guinea.
>
> Your passports, those of your family, and your nanny's passport will be delivered to me along with the release documentation from the Ministry of Justice.
>
> You must make an international wire transfer of USD$1,245,000 for the full restitution of the crew of Bradley Scott Schlenker and Fabio Nicolas Espinal Mr. Nuñez (see attachment). They will not seek additional compensation or legal action and will sign a formal statement to that effect.
>
> You must make an international wire transfer of USD$652,750 for the ground team that facilitated the release of Fabio and Brad (see attachment).
>
> We will all go to the airport together and depart for Paris. Our local benefactor will accompany the group from Conakry to Paris to ensure your protection.
>
> I cannot legally retain possession of your passports. Should you decide not to cooperate with the Guinean government, I will return your passports and documents to the Senior Gendarmerie Commander who initiated your detention.

Ex. 1 (ECF No. 2-6 at 3). The letter also stated that Kent had been retained by "the owners of the Gulfstream IV N520GP (operated by AirChoice, LLC)" who had "retained [his] services to recover and repatriate the aircraft." *Id.* (ECF No. 2-6 at 2). This brazen admission of direct conflict is apparently a reference to some dispute between the Reis family and the former owners of the Gulfstream regarding the aircraft. Unless Ms. Reis agreed to make payments to Defendants, Kent would do the following:

> The legal American owners of the Gulfstream IV N520GP will report the aircraft as stolen to Guinean authorities, providing copies of the ownership documents and my power of attorney to recover and repatriate it.
>
> The legal American owners of the Gulfstream IV N520GP will report the aircraft as stolen to the United States Embassy in Guinea, providing copies of documents

> proving that American citizens are the legal owners of the detained aircraft, along with my power of attorney to recover and repatriate it.
>
> The legal American owners of the Gulfstream IV N520GP will provide the purchase contracts and bank transactions demonstrating that your father, Valdir Colognese Gama, is the true buyer of the aircraft and used an elaborate scheme to default on payments, misappropriate the aircraft, and conceal it in Brazil.
>
> The legal American owners of the Gulfstream IV N520GP will provide the Senior Gendarmerie Commander who initiated your detention with a detailed list of your family's extensive assets and recent acquisitions in the aviation sector.
>
> The legal American owners of the Gulfstream IV N520GP will provide the Senior Gendarmerie Commander who initiated your detention with a report on the true purpose of your husband's visit to Conakry and his intention to transport an additional passenger to Dubai.

*Id.* (ECF No. 2-6 at 3). That supposed aircraft dispute, of course, had nothing to do with Mr. Nuñez, who was now stuck in the middle of this fight when his liberty was at stake in an African country.

More problematically, Kent was highly conflicted and playing multiple sides: working for Mr. Schlenker, trying to get Mr. Nuñez to pay money, and attempting to coerce payments from the Reis family. Now Kent was even working for the supposed plane owners, willing to leverage their interest to the detriment of those stuck in Conakry.

Discovering this, Global Reach was compelled to move promptly to protect Mr. Nuñez. On March 19, 2026, Global Reach contacted the U.S. Embassy regarding this letter from Kent, informing the Embassy that Mr. Nuñez had nothing to do with this letter and had no desire to be implicated in this potential extortion conspiracy. Compl. ¶ 64. Global Reach also sought to protect Mr. Nuñez from any misaligned retribution and moved Mr. Nuñez to a safe location, after requesting a recommendation for another hotel accommodation so that Mr. Nuñez would no longer be near Mr. Schlenker. *Id.* Doing so would avoid further communications with and threats by Hawkwood and Kent.

<u>Threatening Text Message</u>. Kent, without the knowledge or permission of Global Reach, further sent Mr. Nuñez a text message with threatening terms, stating that there "is only one way out for you" and Reis, and that Reis (referencing the letter above) "has my terms if he changes his mind." Compl. ¶¶ 73-75; First Ramsey Decl. ¶ 44 (ECF No. 2-4 at 11). In the same message, Kent threatened in the harshest terms to falsely report Mr. Nuñez to the Drug Enforcement Administration ("DEA"), stating: "Next time you talk with your wife, let her know that I am working with the Embassy and the FAA. I am also going to contact the DEA, because we were able to implicate the plane in trafficking operations all over Mexico, South, and Central. And just to be a dick, Im [sic] going to send all my all of my reports to Delta."




Ex. 3 (ECF No. 2-8 at 2). Kent was thus threatening Mr. Nuñez's liberty in the United States and his future piloting career, wrongfully interfering with Global Reach's efforts, involving his family, and extorting Mr. Nuñez—all just to get Hawkwood paid.

While the threat did not work, Mr. Nuñez and Global Reach are still paying dearly for standing up to Defendants.

The threats from Hawkwood took other forms. For example, Mr. Schlenker, while under the influence of Kent, sent Mr. Nuñez an ominous message containing a Bible verse stating

something to the effect of "the wicked will be punished," which Mr. Nuñez took to be a thinly veiled threat against him. George Decl. ¶ 21 (ECF No. 2-5 at 6).

The "Jocamey Avocats" Dossier. Kent and Hawkwood also, without Plaintiff's permission or knowledge, prepared and sent a dossier to third parties, at least including Mr. Nuñez, entitled "Jocamey Avocats," making allegations against Mr. Nuñez's Guinean lawyer, Jean-Baptiste Jocamey Haba (the "Dossier"). Compl. ¶¶ 66-71; Ex. 2 (ECF No. 2-7 at 2-4). The letter's premise is to undermine client confidence in both the lawyer and Global Reach by showing Haba's "operational links to the current Guinean regime, and the reasons why a high-profile NGO like Global Reach would align with such a figure despite his controversial reputation." Ex. 2 (ECF No. 2-7 at 3).

Defendants' Dossier attacks Haba's reputation, calling him "gatekeeper" for controversial Guinean figures and stating he is involved in "Corrupt Practices & 'Settlement' Model." Defendants accuse Haba of "Legal Sabotage" with links to the Guinean "Military Junta" and a variety of supposedly shady characters. *Id.* The dossier further alleged Haba also coordinates his efforts with the high-profile Conakry prison where Mr. Nuñez and Mr. Schlenker were held. *Id.*

More notable is the Dossier section concerning Global Reach, stating that "By working with Haba, Global Reach may be unwittingly **subsidizing the corruption** that is keeping the pilots in jail" and that "Global Reach gives Haba **international legitimacy**" in "exchange" for "intel." *Id.*

None of those statements about Global Reach is remotely true, which Defendants most assuredly know. To be clear, Global Reach does not work with or coordinate with Haba, and it has had no contact with him or his firm since March 20, 2026, when Global Reach reached out to Haba to inquire about the details of the requirement that Mr. Nuñez notify the authorities when he

changes locations. Compl. ¶¶ 69-72; George Decl. ¶ 15 (ECF No. 2-5 at 4). Haba did not respond, and Mr. Nuñez has new counsel in Guinea.

Regardless, the message from Defendants was clear: once turned down by Mr. Nuñez as a paying client, they would take any action they could to interfere with Global Reach's *pro bono* efforts to secure Mr. Nuñez's release from Guinea.

### D. Hawkwood Blocks Global Reach's Recent Efforts to Repatriate Mr. Nuñez

Disastrously, Defendants have since made good on their threats. Mr. Nuñez and the others were about to be released from Guinea, only for Defendants to interfere and block that release. In terms of the requested emergency relief, this is truly the stack of bricks that has broken the camel's back.

On or around April 3, 2026, a Guinean court ordered that Mr. Nuñez, Mr. Schlenker, and Reis be allowed to depart Guinea pending continued proceedings. Compl. ¶ 14; Ex. 4 (ECF No. 2-9). The order would go into effect in 10 working days (two weeks), on or around April 17, 2026, provided there were no appeals. *Id.*

That order was apparently unhelpful to Hawkwood and Kent (and their own supposed Iowan clients), as it would allow everyone out of Guinea without any payments to Defendants. So, the next day, on April 7, a letter dated March 26, 2026, Kent had sent to the Guinean Minister of Justice was filed with the Guinean court, accusing Reis of both stealing the plane and being implicated in an international drug trafficking scheme. Compl. ¶¶ 77-79; Ex. 5 (ECF No. 2-9).

The Hawkwood Group's March 26 letter was sent to the Guinean Minister of Justice, the U.S. Embassy and its Regional Security Officer, and the Federal Aviation Administration. *Id.*; Ex. 5 (ECF No. 2-9 at 6). This letter accused Reis of stealing the Gulfstream from its rightful owners (Defendants' other clients), engaging in drug trafficking, and violating FAA rules. *Id.* The letter repeated that Reis must pay $1,245,000 for restitution and $652,750 to Hawkwood. *Id.* That filing

blocked Mr. Nuñez from freedom, as it came during the 10-day "quiet" period. Compl. ¶ 80. It was and remains an unforgiveable act of greed, prioritizing financial return over the freedom of two Americans.

Defendants' behavior has continued on what purported to be Mr. Schlenker's social media sites, where more false accusations are lodged against Mr. Nuñez. Mr. Schlenker's X account is handled "@BradPOA," with POA presumably standing for "Power of Attorney." Compl. ¶ 83. The account typically discusses Mr. Schlenker in the third person, referencing Mr. Schlenker by his first name Brad (as opposed to in the first-person "I" or "me"), so is thus believed to be used by Defendants on Mr. Schlenker's behalf. *Id.* One such post was called "The Conakry Trap: Corporate Narcos, a Stolen Gulfstream, and the Betrayal of an American Pilot," where @BradPOA makes the false claim that "co-pilot Fabio Espinal Nuñez is reportedly working in coordination with the Reis family and their local attorneys—including the controversial Maître Abdourahamane Dabo and Maître Jean-Baptiste Jocamey Haba—to frame Mr. Schlenker for the 'unauthorized' flight, effectively making him the fall guy for the international theft." *Id.* ¶ 82.

All of this led the Guinean Prosecutor's office to change its position and seek an appeal of the order releasing Mr. Nuñez and the others from Guinea. Indeed, on April 10, 2026, Mr. Nuñez's attorneys were informed that the Prosecutor's office filed an appeal in the proceedings against Mr. Nuñez with the intent to reverse the judicial determination that Mr. Nuñez could leave the country pending trial. *Id.* ¶ 85. On April 13, 2026, Guinean authorities informed Mr. Nuñez's Dominican Republic attorney that the recent appeal filed by the prosecutor's office was due, in part, to the recent social media posts made by Mr. Schlenker which criticized the government and justice system of Guinea. *Id.* ¶ 86; Ex. 6 (ECF No. 2-11). According to Mr. Nuñez's Guinean attorney, the appeal of the approval to leave Guinea will take somewhere between 1-2 months (unless

expedited). George Decl. ¶ 25 (ECF No. 2-5 at 7). If a trial is to occur, it could take place before a *tribunal correctionnel* (like a jury), which would take a month, or before a *judge instructional* (akin to a bench trial), which would take 2-3 weeks. *Id.*

## III. STANDARD OF REVIEW

A complaint is legally sufficient when it contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Green v. U.S. Dep't of Just.*, 392 F. Supp. 3d 68, 80 (D.D.C. 2019) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted)). A claim is facially plausible when the facts pleaded in the complaint allow the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. The standard does not amount to a "probability requirement," but it does require more than a "sheer possibility that a defendant has acted unlawfully." *Id*. The court must give the plaintiff the "benefit of all inferences that can be derived from the facts alleged." *Kowal v. MCI Commc'ns Corp*., 16 F.3d 1271, 1276 (D.C. Cir. 1994). The Court may consider "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice," *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002).

To the extent Defendant moves under 12(b)(1), the Court "must review the complaint liberally, granting the plaintiff the benefit of all inferences that can be derived from the facts alleged." *Zaidan v. Trump*, 317 F. Supp. 3d 8, 16 (D.D.C. 2018). When so doing, the Court has "broad discretion to consider relevant and competent evidence" to resolve factual issues raised by a Rule 12(b)(1) motion. *Finca Santa Elena, Inc. v. U.S. Army Corps of Eng'rs*, 873 F.Supp.2d 363, 368 (D.D.C. 2012) (citing 5B Charles Wright & Arthur Miller, Fed. Prac. & Pro., Civil § 1350 (3d ed. 2004)).

To the extent Defendant moves under 12(b)(2), Global Reach need only make "a *prima facie* showing of the pertinent jurisdictional facts' to survive a motion to dismiss." *IMAPizza, LLC v. At Pizza Ltd.*, 334 F. Supp. 3d 95, 107 (D.D.C. 2018). Plaintiffs at this stage may "rest their argument on their pleadings, bolstered by such affidavits and other written materials as they can otherwise obtain." *Mwani v. bin Laden*, 417 F.3d 1, 7 (D.C. Cir. 2005). When deciding personal jurisdiction without an evidentiary hearing, the Court must resolve factual disputes in favor of the plaintiff. *IMAPizza, LLC*, 334 F. Supp. 3d at 107.

To the extent the Court has any concern regarding jurisdiction, it should order limited and expedited jurisdictional discovery. *GTE New Media Servs. Inc. v. BellSouth Corp*., 199 F.3d 1343, 1351 (D.C. Cir. 2000) (citing *Crane v. Carr*, 814 F.2d 758, 764 (D.C. Cir. 1987)); *Does 1-9 v. Dep't of Just*., No. 25-CV-325 (JMC), 2025 WL 894120, at *5 (D.D.C. Mar. 22, 2025). And it may "hold an evidentiary hearing to determine, by a preponderance of the evidence, whether personal jurisdiction exists." *IMAPizza, LLC*, 334 F. Supp. 3d at 107.

## IV. <u>ARGUMENT</u>

To the extent Defendant Kent's filings constitute a Motion to Dismiss, that motion fails. This Court properly has personal jurisdiction over Defendants, and venue is proper in this district. In addition, Plaintiff has pleaded more than enough facts to establish that Defendants are interfering with its charitable business.[3] Furthermore, to the extent his grounds for dismissal have been

---

[3] Kent did not allege that this Court lacks subject matter jurisdiction under 28 U.S.C. § 1332. "District courts have original jurisdiction over suits where the amount in controversy exceeds $75,000 between citizens of different states." *Hobson v. Green Fin. Auth*., No. CV 26-531 (JDB), 2026 WL 880014, at *2 (D.D.C. Mar. 31, 2026) (citing Id. § 1332(a)(1)). Global Reach has alleged the parties are completely diverse, *see* ECF No. 1 at 7 ¶ 22, which Kent does not contest. And as explained in its Supplemental Brief, *see* ECF No. 28 at 1-4, Global Reach has in excess of $75,000 in damages. Therefore, subject matter jurisdiction properly exists.

addressed by Plaintiff's earlier responses, it hereby incorporates those arguments by reference herein.

**A. <u>Global Reach Has Established Personal Jurisdiction over Defendant Kent</u>**

The Court has "specific personal jurisdiction over" both Defendants because "(1) jurisdiction is authorized under the District's long-arm statute, and (2) [] such an exercise of jurisdiction comports with the Due Process Clause." *Media Matters for Am. v. Paxton*, 138 F.4th 563, 574 (D.C. Cir. 2025).

1. <u>Jurisdiction over Defendants Is Authorized Under the Long Arm Statute</u>

Multiple provisions of the D.C. long-arm statute, D.C. Code § 13-423, are applicable here. Subsection (a)(1) permits the exercise of jurisdiction over any nonresident who "transact[s] any business in the District," which "embraces those contractual activities of a nonresident defendant which cause a consequence here," even if the defendant was not physically present in the District. *See Paxton*, 138 F.4th at 576. Transacting business need not be contractual or commercial but include activities that cause "in forum consequences that flow from the nonresident's activities," with a single act sufficient has long as the contact is "voluntary and deliberate, rather than fortuitous." *See id.* (cleaned up). "It is now well-settled that the 'transacting any business' provision [of § 13-423(a)(1)] embraces those contractual activities of a nonresident defendant which cause a consequence here." *Mouzavires v. Baxter*, 434 A.2d 988, 992 (D.C. 1981) (emphasis added); *see also Overseas Partners, Inc. v. PROGEN Musavirlik*, 15 F.Supp.2d 47, 51 (D.D.C. 1998) (applying same reading of § 13-423's "transacting business" provision); *Schwartz v. CDI Japan, Ltd.*, 938 F. Supp. 1, 5 (D.D.C. 1996) (same). If subsection (a)(1) applies, the inquiry merges with the constitutional test for personal jurisdiction. *See Paxton*, 138 F.4th at 576.

The *Paxton* case is instructive; jurisdiction was proper under the subsection (a)(1) when former Texas Attorney General Ken Paxton sent a Civil Investigatory Demand to a District of

Columbia corporate entity via FedEx and a process server, with the D.C. entity then suing Paxton for retaliation. *See id.* at 576–77.

Subsection (a)(3) is another basis for jurisdiction. "Under that provision, the relevant conduct is that of the alleged tortfeasor, who may act directly or through an agent." *Elemary v. Philipp Holzmann AG*, 533 F. Supp. 2d 116, 125 (D.D.C. 2008) (cleaned up). There, the plaintiff alleged that the defendant obstructed a proposed agreement with "a federal agency [DOJ] by communicating and negotiating directly with that agency." *See id.* at 126. "[G]iven that DOJ headquarters are in the District of Columbia…the Court may reasonably infer that some part of the alleged tortious conduct occurred in the District." *See id.*

Subsection (a)(4) also provides for jurisdiction over defendants that cause tortious injury in the District by actions outside the District when they also regularly do or solicit business, engage in any other persistent course of conduct, or derive substantial revenue from goods used or services rendered in the district. D.C. Code § 13-423(a)(4). The course of conduct tying defendants to D.C. need not be connected to the tortious injury; "under § (a)(4) defendants can be haled into court for out-of-district acts with no connection to the acts forming the 'persistent course of conduct in the District.'" *Akhmetshin v. Browder*, 275 A.3d 290, 294–95 (D.C. 2022) (citing *Etchebarne-Bourdin v. Radice*, 982 A.2d 752, 762–63 (D.C. 2009)). And that "persistent course of conduct" in the District, in turn, is satisfied where "there are minimum contacts with the forum sufficient to satisfy due process concerns." *Id.*

Regardless of which one applies, jurisdiction is proper in the District of Columbia. As alleged in the Complaint and supported by evidence, Defendants' actions to interfere with Global Reach's relationship with its client involved communications with numerous Federal agencies located in the District of Columbia, including the U.S. State Department, the Federal Aviation

Administration, and the DEA, a DOJ component. Compl. ¶ 74 (Kent stating he is "working with the Embassy and the FAA"); Exs. 16-18 (targeting D.C. entities through social media). Defendants targeted Global Reach's key constituencies located the District of Columbia as a means to target Global Reach, a D.C. entity. That is enough to satisfy subsection (a)(1).

For similar reasons, subsection (a)(3) also is satisfied. Defendants targeted the District of Columbia with multiple communications that harmed Global Reach's relationships here. Doing so caused tortious injury to a D.C. entity, where Plaintiff Global Reach is located and depends on its reputation. This conduct satisfies both prongs of subsection (a)(3).

Subsection (a)(4) also is satisfied because each Defendant engages in a persistent course of conduct in the District. Defendant Kent is a "frontier market consultant" for D.C.-based security intelligence firm, Shockley Enterprise & Government Services (SEGSCO).[4] *See* Compl. ¶ 19. This alone satisfies D.C. Code § 13-423(a)(4) because it is substantially likely that in that role Kent has rendered services to government entities in the District, derived revenue from such actions, and otherwise engages persistently within the District as an employee of that District entity.

As to the organizational Defendant, Hawkwood, it is not represented by counsel, has not properly appeared before this Court, has not contested personal jurisdiction, and has not filed an Answer or response to Global Reach's Motion.[5] Therefore, at this juncture, there is no personal jurisdiction defense by Hawkwood for this Court to address.

---

[4] *See* Bob Kent, Our Team, at https://segsco.com/our-team/ (last accessed April 27, 2026). Mailing Address for SEGSCO is 1629 K St. NW, Suite 300, Washington, D.C. 20036.

[5] The Hawkwood Group is "appearing pro se" via its Managing-Member Kent. *See* Answer at 1, 5. But the Hawkwood Group cannot be represented *pro se*, and Kent is not an attorney and cannot represent Hawkwood either. "It has been the law for the better part of two centuries…that a corporation may appear in the federal courts only through licensed counsel," a rationale that "applies equally to all artificial entities." *Rowland v. Cal. Men's Colony*, 506 U.S. 194, 201–02 (1993). This District has repeatedly held that LLCs must be represented by counsel to appear before the Court. *See Peek v. Clear Sky Fin., LLC*, No. CV 24-3125 (RC), 2024 WL 4932059, at *4 (D.D.C.

But even if the Court did so, personal jurisdiction over Defendants would still be proper. Kent has stated to this Court that he is the "Member-Manager" of Hawkwood, meaning that under the long-arm statute and Constitution his actions are imputed to Hawkwood LLC. D.C. Code § 13-423 ("A District of Columbia court may exercise personal jurisdiction over a person, who acts directly or by an agent…"); *Daimler AG v. Bauman*, 571 U.S. 117, 135 n.13 (2014) (recognizing that agency relationships are relevant to specific jurisdiction because "[a] corporation is a distinct legal entity that can act only through its agents" and thus "can purposefully avail itself of a forum by directing its agents or distributors to take action there.") (citations omitted). Moreover, Hawkwood has separately and further engaged in a persistent course of conduct associated with its government work because it is a federal government contractor. *See* Compl. ¶ 16. *See also Akhmetshin*, 275 A.3d at 294; *id*. at 293 ("[T]his court has not applied the government contacts exception to § (a)(4)").

Regardless, as discussed below, both Defendants have engaged in a "persistent course of conduct" sufficient to satisfy the minimum contacts prong of the due process clause. *Id*. at 294–95. That they have done so is no accident. In order to tortiously interfere with Global Reach's efforts to help its clients, Defendants have repeatedly availed themselves of contacts in Washington, D.C. That alone would satisfy the Constitutional analysis and D.C.'s Long Arm Statute.

---

Dec. 2, 2024) ("An artificial entity 'must be represented by counsel or it will be treated as not having appeared at all.'" (citation omitted and collecting cases); *see also 180 E. Broad Partners LLC v. Ohio Dep't of Tax'n*, 193 F. Supp. 3d 1, 2 (D.D.C. 2014). Hawkwood's Registered Agent, John Furlow, is an attorney barred in the state of Texas. John T. Furlow, available at https://www.texasbar.com/AM/Template.cfm?Section=Find_A_Lawyer&template=/Customsource/MemberDirectory/MemberDirectoryDetail.cfm&ContactID=355210 (last accessed April 29, 2026).

2. Defendants Have Sufficient Minimum Contacts with Washington, D.C.

The tortious interference alleged in the Complaint shows that it was directed towards the District as part of Hawkwood's and Kent's concerted efforts to interfere with their nonprofit competitor, Global Reach. There is no serious dispute that Defendants have been intending to harm Global Reach and interfere with its mission and relationship with Mr. Nuñez and his family, knowing full well that Global Reach was, in Defendants' own words, an "elite DC consulting firm." Defendants did so by engaging in a series of forum related communications to harm Global Reach. Doing so intentionally targets the District of Columbia, tying together "the defendant[s], the forum, and the litigation." *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 775 (1984). Therefore, Defendants should "reasonably anticipate being haled into court" in Washington, D.C. *See World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

Once again, *Paxton* is instructive. There, Paxton's single instance of communicating in the District of Columbia, by sending (from Texas) a FedEx and process server containing an allegedly retaliatory Civil Investigatory Demand answerable in Texas was a sufficient contact to satisfy the minimum contacts test. *See Paxton*, 138 F.4th at 577. The plaintiff there also alleged that it was "suffering substantial adverse effects on their" rights as a result of the mailing and service of the Civil Investigatory Demand. *See id.* As a result, Paxton "should have reasonably anticipated being summoned into court in the District because he knew that the CID and investigation would have a potentially devastating impact" and cause the "brunt of the injury" in the District of Columbia. *See id.* at 578 (cleaned up).

Another analogous case is *Elemary*, 533 F. Supp. 2d 116. Like here, the key claim was for tortious interference with business relationships (a prospective one in that case). *See id.* at 132. The claim was premised on the defendant's "obstruction and usurpation of [the plaintiff's] negotiations with the DOJ, which [the plaintiff's] allegations suggest transpired in the District. *See id.*

at 126. The defendant there did so to block the plaintiff from receiving a large success fee, negotiated in the District of Columbia. Therefore, personal jurisdiction under *Elemary* is established where a tortfeasor engages in communications directed to D.C. residents and entities designed to harm a D.C. plaintiff.[6] *See id.; see also Cent. Freight Lines Inc. v. APA Transp. Corp.*, 322 F.3d 376, 384 (5th Cir. 2003) ("CFL has alleged that APA was aware of CFL's contractual relationship with Dell Computers and that APA intentionally attempted to interfere with that relationship by holding Dell freight hostage in New Jersey and by manipulating the price of freight delivery in the northeast…Texas is not only CFL's home state; it also is the primary location of CFL's business relationship with Dell Computers."). *Fletcher v. Doig*, 125 F. Supp. 3d 697, 709 (N.D. Ill. 2014) ("[A]lthough Doig's conduct originated outside of Illinois, he targeted Fletcher and his dealer Bartlow Gallery, whose business was in Illinois, with the express goal of inflicting commercial harm there").

Defendants' conduct here is analogous to those cases. To continuously interfere with Global Reach's relationship with Mr. Nuñez's fiancéeand family and their goal to bring Mr. Nuñez home, Defendants intentionally sent multiple communications into the District of Columbia. Exemplary is the March 26, 2026, Hawkwood letter (signed by Kent) that was addressed to Guinean authorities. *See* Ex. 5 (ECF No. 2-10). That letter, as alleged, was a critical document that interfered directly with Global Reach's relationship by ensuring that Mr. Nuñez would not be returning home. But that letter also was sent to the U.S. State Department (through the U.S. embassy in Guinea Chargé d'Affaires) and the Federal Aviation Administration (located in Washington, D.C.).[7] That was not the sole communication directed at U.S. Federal entities located in

[6] The claim in *Elemary* was dismissed on Rule 12(b)(6) grounds. *See id.* at 144.

[7] These are not "government contacts" meriting constitutional protections. The government contacts exception is about filings with federal agencies, which are presumed to be constitutionally

Washington, D.C. Defendants, via Kent (managing member of Hawkwood), stated he was reaching out to the State Department (again, through the Embassy), the DOJ component DEA, and the FAA, located in the District of Columbia. As Kent told Mr. Nuñez:




*See also* Compl. ¶ 74; *id.*¶ 82 (accusing Mr. Nuñez of criminal conduct).[8]

That Defendants were seeking to extort Mr. Nuñez into hiring them, and thereby box out Global Reach, is further made clear by Defendants' March 16, 2026, call to Global Reach.

---

protected petitions of the government. *See Companhia Brasileira Carbureto De Calcio v. Applied Indus. Materials Corp*., 35 A.3d 1127, 1132 (D.C. 2012) (government contacts exception is about "right to petition the government"). The exception thus covers things like "lobbying activities" and "government contracting." *Robo-Team NA, Inc. v. Endeavor Robotics*, 313 F. Supp. 3d 19, 21 25 (D.D.C. 2018). No case suggests that Defendants' conduct as alleged—backchannels to the State Department and fraudulent allegations to the FAA—is in the ballpark of the "government contacts" D.C. courts envision. That is particularly so when, as alleged, those contacts are fraudulent. There is certainly no precedential or policy reason why backchannels to decisionmakers used for tortious purpose should be considered "government contacts." *See Companhia Brasileira*, 35 A.3d at 1132-33 (recognizing the importance of the right to petition the government but holding that the government contacts exception does not apply to fraudulent government petitions because "it does not offend the First Amendment to recognize a fraud exception to the government contacts exception").

[8] While DEA Headquarters is now located in Virgina, it remains a constituent agency of the Department of Justice, which is obviously headquartered in Washington, D.C. ("Main Justice"). Criminal law issues relating to international affairs impacting Americans held abroad, are well known to be centrally coordinated by components at Main Justice, including leadership offices and the Criminal Division.

Defendants informed Global Reach that it should "stand down," followed by a string of comments about Global Reach's leadership. Compl. ¶ 59.

Beyond these contacts, there were additional "Tweets" sent by an account, @BradPOA, directed to Washington, DC. On April 13, 2026, the @BradPOA account authored another Twitter Article.[9] *See* McKnight Decl. Ex. 21 (ECF No. 18-1 at 1; 18-4). The article accused Kelton Reis of engaging in "narcotics trafficking and trade-based money laundering, concealing high-purity cocaine within industrial machinery." The Article repeatedly argues that Mr. Nuñez is somehow assisting Reis in those efforts, with his "Dominican attorney known as 'Cesar,' representing the co-pilot, arrives and begins coordinating with Kelton Reis's corrupt local counsel." *Id.* at 2. Later on, the Article expands on this point: "[t]he co-pilot's attorney, 'Cesar,' is reportedly coordinating with local lawyers—including Dabo and Maître Jean-Baptiste Jocamey Haba—to submit documents that further implicate Mr. Schlenker. According to those familiar with the filings, the effort is aimed at shifting liability and potentially using the aircraft itself as leverage for others' release." *Id.* at 4. These attorneys (according to the Article) are part of a corrupt system designed to extort money from detainees. *See id.* at 2–3. This Article was subsequently tagged to the U.S. Embassy, the State Department, the White House, the Senate GOP Caucus, Fox News, former Ambassador John Bolton, the White House Press Secretary, the FBI Director, and the Secretary of State. McKnight Decl. Ex. 22 (ECF Nos. 18-1 at 1; 18-4). This activity is neither incidental nor coincidental. One reason the Defendants' contacts have been repeatedly targeted to and through Washington, D.C. lies in the very nature of their tortious conduct. In order to successfully interfere with Global Reach's efforts on behalf of its client, it is necessary to contact key agencies and

[9] To be sure, there are many others. The @BradPOA account has sent thousands of Tweets (including tagged and other responses) even though it was created only in April 2026.

government officials who work in Washington, D.C. In order to harm Global Reach's reputation in a way that damages its ability to assist its client, it must hit Global Reach where it lives—in this District.[10]

The Tweets directed at individuals (i.e., "tagging") are contacts that should be considered directed at the District of Columbia. As one court found:

> The fact that a Twitter mention or Facebook tag is a means of addressing a public rather than private communication to a particular user does not make it any less an intentional, direct contact. When a Facebook user is tagged or a Twitter user is mentioned, the user receives a notification directing his or her attention to the post, just as an email user receives a notification when he or she receives an email. Defendant does not dispute that numerous courts have found emails to people in the forum state to be relevant contacts for jurisdictional purposes…***At least in the context of this case, a mention on Twitter or a tag on Facebook strikes the Court as akin to an email for purposes of personal jurisdiction.*** By using the "@UChicago" handle in her Twitter posts, it is as if defendant sent open letters to the University of Chicago and posted copies on campus bulletin boards for all to see. The University of Chicago receives the "letter" by receiving a notification about it, and the letter also exists in a public forum where anyone else with interest in the community can read it by searching Twitter for "@UChicago" mentions.
>
> Indeed, the fact that these contacts were public rather than private may strengthen, rather than weaken, the argument that they are sufficiently substantial contacts to permit the exercise of personal jurisdiction. It is difficult to accept defendant's argument that she did not purposefully direct or expressly aim her posts at Illinois, not only because she specifically directed many of them at Illinois-based users such as "@UChicago," but also for the independent reason that the content of the posts suggests that pressuring the University of Chicago to take action against plaintiff and in favor of [a third party] was the goal of her social media campaign.

---

[10] The Court previously inquired how it can be assured that Defendants authored the various "X" posts presented to it. This issue was addressed during the hearing, s*ee* Hr'g Tr. at 25:20–26:25, and in Global Reach's Supplemental Briefing, *see* ECF No. 18 at 8-9. In particular, the Second Kent Submission has now admitted that Defendants were indeed the authors, stating that Global Reach is seeking to establish personal jurisdiction "based solely on ***Defendants' social media activity . . . .***" *See* Second Kent Submission at 1 (emphasis added).

*Majumdar v. Fair*, 567 F. Supp. 3d 901, 911 (N.D. Ill. 2021) (emphasis added). The same is true here, because Defendants have repeatedly tagged those in the District of Columbia, acting like "an email for purposes of personal jurisdiction." *See id.*

These contacts, all of which pre-date the Complaint, are sufficient alone to establish personal jurisdiction over Defendants in the District of Columbia. *See, e.g.*, Hr'g Tr. at 19:18–20:5. Moreover, all these communications are in accordance with Defendants' purported business model, which relies on making meaningful inroads with entities like the State Department, the FAA, the Department of Justice, and other D.C. Federal entities to press the case for Defendants' clients (albeit falsely). Unsurprisingly, Defendants direct both their public and private statements to a myriad of D.C. actors, including multiple executive branch officials, elected officials, D.C.-based journalists, D.C. consultants, and the whole infrastructure spawned around the Federal government. Indeed, part of the reason Defendants have been sued now is the tortious misuse of those very contacts.

Defendants' actions were intentionally designed to interfere with Global Reach's mission on behalf of Mr. Nuñez's family and fiancéeto bring him home. To put it simply: Defendants were actively threatening and disparaging Mr. Nuñez and Global Reach, hampering his return stateside, and thus targeting the District of Columbia by intentionally interfering with Global Reach's efforts. Defendants' additional contacts with D.C. authorities to execute that targeting is further evidence of why jurisdiction is proper here.

In addition, Defendants plainly are aware that they are targeting a D.C.-based organization, Global Reach, to accuse it of all sorts of improprieties. Global Reach has its headquarters in, and operates out of, the District. Compl. ¶ 15. Global Reach's ability to do its work depends on its good reputation with decision-makers inside the District. Compl. ¶¶ 15, 96. The intended harm to

Global Reach's reputation thus occurs in the District of Columbia, so that Defendants' interference struck at the heart of Global Reach's purpose and "directly affected and interfered with [Global Reach's] core [charitable] activities," *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024), that are alleged to be in D.C. In short, Defendants were well aware that (1) Global Reach was headquartered in D.C., (2) Global Reach's charitable activities are dependent on its D.C. connections, (3) the formation of Global Reach's client relationship occurred in D.C., and (3) importantly, Defendants' interference with Global Reach was directed towards D.C. and thus would be interference inside of D.C. Compl. ¶¶ 18–19, 34.

As a result of Defendants' conduct, the "brunt" of the interference is felt here. Indeed, if Defendants were to be successful, it would have a "potentially devastating impact" on Global Reach "in the District." *Paxton*, 138 F.4th at 578 (quoting *Calder v. Jones*, 465 U.S. 783, 789–90 (1984)). A substantial portion of Global Reach's negotiation work to bring Mr. Nuñez home is conducted from D.C., because that is Global Reach's headquarters and nerve center. Compl. ¶ 15. The relationship with Plaintiff's client was initiated through Plaintiff's website, Compl. ¶ 35, which is hosted in D.C. Defendants were aware of this. Mot.25-26; Compl. ¶¶ 18-19, 34. The fact that Defendants now target Plaintiff as the "D.C. Elite" confirms the intent and knowledge that Defendants' interference would harm Plaintiff here. Exs. 16-18.

3. <u>Global Reach Satisfies the Modern *Calder* Effects Test</u>

This Court also has jurisdiction under *Calder*'s effects test. In *Calder*, the Supreme Court held that personal jurisdiction existed in California even though the conduct at issue took place in Florida because "their intentional conduct in Florida [was] calculated to cause injury to [the plaintiff] in California." *See Calder*, 465 U.S. at 791. Courts thus apply a three-part "effects" tests based on a defendant's "(1) intentional actions (2) expressly aimed at the forum state (3) causing harm, the brunt of which is suffered—and which the defendant knows is likely to be suffered—in the

forum state." *See Alpine Consulting Partners, LLC v. Jacokes*, No. CV 25-913 (SLS), 2025 WL 2959574, at *5 (D.D.C. Oct. 17, 2025).

In *Alpine*, the Court found jurisdiction because the defendants intentionally targeted the plaintiff's relationships with existing clients. *See id.* The harm was "calculated to cause injury" in D.C., which included the "unlawful acquisition of Alpine's proprietary information and interference with its clients thereafter are similarly expressly aimed at this forum, which is sufficient to support jurisdiction under *Calder*." *See id.* And the brunt of the injury occurred in D.C., where the plaintiff was injured as a result of the conduct. *See id.*; *see also Frida Kahlo Corp. v. Pinedo*, No. 24-10293, 2026 WL 1045144, at *5 (11th Cir. Apr. 17, 2026) ("These intentional torts took aim at Florida, as Defendants sent multiple cease-and-desist letters to Florida entities, in an attempt to stop an exhibition in Miami. That Defendants sent 'only' two letters is unpersuasive. After all, a single tortious act can establish purposeful availment without regard to whether the defendant had any other contacts with the forum state…") (cleaned up); *Weiser L. Firm, P.C. v. Hartleib*, No. 23-1889, 2024 WL 5219737, at *6 (3d Cir. Dec. 26, 2024) (finding that animus to attack Pennsylvania company was sufficient to demonstrate that defendant aimed its tortious conduct at the forum).

Another case supporting Global Reach is *Johnson v. Griffin*, 85 F.4th 429 (6th Cir. 2023). There, comedian Kathy Griffin accused the plaintiff of being homophobic in Tweets, making specific mention that the plaintiff was located in Tennessee. *See id.* at 431. Griffin also tagged the plaintiff's employer directly in her Tweets, causing the plaintiff harm. *See id.* As the Sixth Circuit explained:

> Griffin directly communicated with [the employer] in her first tweet and, after that tweet prompted his firing, she followed up directly with [the employer] to urge it to dismiss [the plaintiff] from its Board of Directors, all while promising more harassment if the Tennessee company did not bow to her wishes…she cannot deny

> that, by tagging [the employer] she sent these communications directly to the company. And she cannot deny that her follow-up tweets about removing [the plaintiff] from the Board amounted to direct communications with the Tennessee company.

*Id.* at 434–35. Therefore, the Sixth Circuit found jurisdiction was proper.

Here, Global Reach satisfies all three prongs, the first and third of which are established almost without analysis. Global Reach has alleged an intentional targeting by Defendants of Global Reach. ECF No. 2-1 at 30-31; Ex. 5 (ECF No. 2-10) (evincing intent to interfere with Mr. Nuñez's return); Compl. ¶ 82 (alleging use of social media to intentionally interfere). Global Reach also alleges that it was harmed in D.C., through its reputational standing and in its relationship with its client and the mission for her. Compl. ¶¶ 15, 18-19, 34-35, 96. Brief examination demonstrates that Global Reach satisfies the second prong too, insofar as Defendants have "expressly aimed" their activities at D.C. by: (1) attacking Global Reach, its relationship with Mr. Nuñez's fiancéeand family centered around Global Reach's D.C.-based activities, and (2) contacting numerous D.C. persons and entities to interfere further with Global Reach's activities in the District of Columbia.

Therefore, personal jurisdiction is proper over Defendants in the District of Columbia.[11]

### B. <u>Venue Is Proper in the District of Columbia</u>

For similar reasons, venue is proper in the District of Columbia. A "substantial part of the events" giving rise to this claim occurred in the District because the interference with Plaintiff's business occurs and is felt primarily in the District, where Plaintiff's work to fulfill its agreement

---

[11] To the extent the Court believes any of the facts alleged herein need more development, "jurisdictional discovery is justified" because Plaintiff has demonstrated it can supplement its jurisdictional allegations through discovery. *GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1351 (D.C. Cir. 2000) (citing *Crane v. Carr*, 814 F.2d 758, 764 (D.C. Cir. 1987)). Any such discovery could be duly "expedited" while the Motion is pending. *See Does 1-9 v. Dep't of Just.*, No. 25-CV-325 (JMC), 2025 WL 894120, at *5 (D.D.C. Mar. 22, 2025).

with its client is primarily orchestrated, supra at 17; and because the brunt of the harm from the interference is likewise felt in the District. *See* 28 U.S.C. § 1391(b)(2).

Even if the Court considered Guinea to be where the substantial part of the events occurred, then § 1391(b)(3) would permit venue in the District of Columbia. Hawkwood is a Texas entity and Kent is a North Carolina resident, which establishes that all Defendants do not reside in one district. *See id.* § 1391(b)(1). Accordingly, "there is no district in which an action may otherwise be brought," so proper venue lies in "any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action." *See id.* § 1391(b)(3).

### C. <u>Global Reach Has Stated a Tortious Interference Claim</u>

Global Reach has pleaded all elements of a claim for tortious interference. To make out a prima facie case of tortious interference with a business relationship, the plaintiff must demonstrate: "(1) existence of a valid contractual or other business relationship; (2) the defendant's knowledge of the relationship; (3) intentional interference with that relationship by the defendant; and (4) resulting damages." *Havilah Real Prop. Servs., LLC v. VLK, LLC*, 108 A.3d 334, 345–46 (D.C. 2015).

#### 1. <u>Global Reach Has a Valid Business Relationship with Mr. Nuñez's Fiancée.</u>

Under D.C. law, "business expectancies, not grounded on present contractual relationships but which are commercially reasonable to anticipate*,* are considered to be property and therefore protected from unjustified interference." *Carr v. Brown*, 395 A.2d 79, 84 (D.C. 1978). Courts have found charitable corporation work to be "business" for the tort of intentional inference with a business relationship. *See, e.g.*, *LeSEA, Inc. v. LeSEA Broad. Corp.*, 379 F. Supp. 3d 732, 737 (N.D. Ind. 2019).

Here, Global Reach is a nonprofit organization, headquartered in D.C., dedicated to bringing home Americans and others who are wrongly held abroad, whether by terrorist groups, criminal gangs, or foreign governments. First Ramsey Decl. ¶¶ 8-9 (ECF No. 2-4 at 2). Global Reach represents and works on behalf of the families of these victims, at no cost to them. *Id.* On March 16, 2026, Global Reach was formally engaged by Mr. Nuñez's fiancéeto assist in Mr. Nuñez's safe and lawful release and return to the United States. Global Reach agreed to the engagement based on its assessment that Mr. Nuñez was wrongfully detained, as well as the fact that Global Reach has experience, capabilities, and contacts which could assist in resolving the matter. Compl. ¶ 41. That is a valid business relationship protected under D.C. law.

Global Reach structured its agreement with Mr. Nuñez's fiancée, as opposed to Mr. Nuñez himself or other members of the Mr. Nuñez family as a matter of exigency, with two key considerations in place. *First*, Global Reach wants the detainee to concentrate on himself or herself, and focus on remaining safe and alive. Decisions made by detainees are made under extreme stress and amid trauma. Second Ramsey Decl. ¶ 17 (ECF No. 18-8 at 5). And in many circumstances, the detainee may not be able to communicate. *See id.* Even now, Mr. Nuñez is not free and he has "been held *incommunicado* for long periods since [his] arrest." *See* Mr. Nuñez Decl. ¶ 13 (ECF No. 18-6 at 3).

*Second*, Global Reach needs to have a single point of contact to make decisions for the detainee, so that Global Reach has clarity as to who is providing direction and instruction. *See* Second Ramsey Decl. ¶ 18 (ECF No. 18-8 at 5-6); *see also* Mr. Nuñez Decl. ¶ 13 (ECF No. 18-6 at 3). While Global Reach's contractual relationship is with Mr. Nuñez's fiancée, that relationship is for the ultimate benefit of Mr. Nuñez.

2. Defendants Had Knowledge of and Interfered with Global Reach's Charitable Business Relationship

Global Reach was originally contacted by Mr. Schlenker's family in connection with this matter, but Mr. Schlenker ultimately engaged Hawkwood Group. First Ramsey Decl. ¶¶ 18-19 (ECF No. 2-4 at 5). Hawkwood Group is aware that Mr. Nuñez's family hired Global Reach instead of them and has been interfering with Global Reach's business relationship, as described herein, seeking its own profit, through threats to compromise efforts to bring Mr. Nuñez home. In particular, Defendants were contacted directly by Global Reach's Ramsey to discuss the dispute. *Id.* ¶ 34 (ECF No. 2-4 at 8). That knowledge satisfies this prong.

Defendants have both interfered with Global Reach's business relationship with Mr. Nuñez's fiancéeand have also caused reputational harm. Both constitute forms of tortious interference. Defendants' interference—peppered with threats to Mr. Nuñez, false statements about Plaintiff and Mr. Nuñez, and extortion attempts—is the precise type of "egregious" conduct (slander, physical coercion, fraud, and disparagement) that D.C. courts find tortious. *Bowhead Info. Tech. Servs., LLC. v. Catapult Tech. Ltd*., 377 F. Supp. 2d 166, 174–75 (D.D.C. 2005); *see also Liberty Leather Corp. v. Callum*, 653 F.2d 694, 699–700 (1st Cir. 1981) ("Undoubtedly a cause of action for tortious interference with business relations may rest upon defamatory remarks."). Defendants have taken multiple active and intentional steps to interfere with Global Reach's important work to the detriment of its business, mission, and reputation. These actions also negatively impact Global Reach's relationship with Mr. Nuñez's fiancéethat is centered around brining Mr. Nuñez home.

Defendants' interference has been detailed in Plaintiffs' Complaint, Motion for Temporary Restraining Order, and Supplemental Memorandum *See*, ECF Nos. 1, 2, 18. These acts have included causing court documents to be filed in Guinea that blocked the imminent release of Mr.

Nuñez as well as Mr. Schlenker and Reis, spreading false information about Global Reach, pressuring Mr. Nuñez to drop Global Reach and go along with Defendants' "plan," extorting others (and their family members) who have been detained for huge amounts of money, and even threatening Mr. Nuñez directly that he will be referred to the DEA and future employers such as Delta airlines. Compl. ¶¶ 45-87. Defendants have now admitted to using a proxy X account for Mr. Schlenker, Second Kent Submission at 1. They used that account to make false claims regarding Mr. Nuñez, Compl. ¶ 82, and attack the Guinean government and its justice system which caused the Guinean prosecutor filed an appeal to prevent the departure of Mr. Nuñez (and Mr. Schlenker and Reis), *id.* ¶¶ 84-86. These actions have interfered and continue to interfere with Global Reach's mission to bring Mr. Nuñez home, which is the centerpiece of its relationship with the client (Mr. Nuñez's fiancée).

3. <u>Global Reach Has Been Harmed as a Result of Defendants' Interference</u>

Global Reach has been harmed in its mission both for its client in the Mr. Nuñez matter and other clients in multiple ways. Global Reach's relationship with Mr. Nuñez has been harmed, since it has been unable to return him home safely and legally. There has been concrete economic harm as described in the Supplemental Briefing on damages. ECF No. 28 at 1-4 (incorporated herein for reference).

Furthermore, Defendants have attacked Global Reach's reputation, falsely accusing Global Reach of engaging in corrupt acts. Injury to reputation, including before government bodies, qualifies as harm for tortious interference purposes. For example, in *Elemary v. Philipp Holzmann A.G.*, "consequent injuries" included the following: "the actions alleged in the Complaint harmed Plaintiff's standing in the U.S. Senate, one of her major theatres [sic] of operation…Defendants' damages inflicted on Plaintiff arose through…completely and intentionally discrediting Plaintiff in the presence of [various U.S. government officials] who had earlier supported Plaintiff's

activities." 533 F. Supp. 2d 116, 124–25 (D.D.C. 2008). Similarly, the D.C. Court of Appeals, citing the Restatement (Second) of Torts, has explained that actual harm to reputation is a redressable injury if reasonably to be expected to result from the tortious interference. *Havilah*, 108 A.3d at 353 (citing Restatement (Second) of Torts § 774A).

Global Reach's primary and most valuable business asset is its reputation for expertise and trustworthiness. In the world of diplomacy, Global Reach's ability to secure the release of unlawfully detained U.S. persons depends entirely on its good reputation, trustworthiness, word of mouth, and the public perception of its credibility and effectiveness with key decision makers. Defendants' actions have harmed Global Reach's reputation by falsely attacking Global Reach to government stakeholders and future negotiating partners. Defendants falsely claimed that Global Reach works directly with a controversial Guinean attorney and "may be unwittingly **subsidizing the corruption** that is keeping the pilots in jail." (emphasis in original). That is a cognizable harm that can be redressed by injunctive relief.

Therefore, Global Reach has demonstrated it has been harmed by Defendants' interference.

4. Defendant Kent Has Not Established His Interference Was Legally Justified or Privileged

It is not Plaintiff's burden to show lack of privilege; once a plaintiff has established a prima facie case, the burden shifts to the defendant to show that any interference "was legally justified or privileged." *Onyeoziri v. Spivok*, 44 A.3d 279, 287 (D.C. 2012) (citation modified). The legal privilege defense protects an actor "only when (1) he has a legally protected interest, and (2) in good faith asserts or threatens to protect it, and (3) the threat is to protect it by appropriate means." *Vantage Commodities Fin. Servs. I, LLC v. Willis Ltd.*, 531 F. Supp. 3d 153, 179 (D.D.C. 2021), *aff'd sub nom. Vantage Commodities Fin. Servs. I, LLC v. Assured Risk Transfer PCC, LLC*, 31 F.4th 800 (D.C. Cir. 2022).

Here, Defendant Kent has not raised any such defense in any serious form, stating only that "Any actions taken by Defendants were justified, privileged, and undertaken in good faith, for protection of their client, his medical health, or property" and "Defendants acted reasonably, lawfully, and in good faith based upon information available to them at the time." Even if this were an adequate raising of the defense, Defendants lack legal justification or privilege for their interference. Their actions include spreading false information about Global Reach, threatening the wife of the owner of the aircraft (Ms. Reis), threatening to report Mr. Nuñez to the DEA unless he paid Defendants, trying to coerce Mr. Nuñez to go along with their plans, spreading false press about Mr. Nuñez, brazenly telling Global Reach to "stand down," and causing to be filed a court document that prolonged the detention of Mr. Nuñez. Defendant Kent has not explained why any of these actions were justified; to the contrary, Defendants' actions are far beyond the bounds of what may be considered lawful or appropriate competition between businesses operating in a similar space. *See Vantage Commodities Fin. Servs. I, LLC*, 531 F. Supp. 3d at 179.

## V. **CONCLUSION**

Based on the above, and the entire record before this Court, Defendant Kent's motion to dismiss should be denied.

May 11, 2026

Respectfully submitted,

*/s/ Katherine L. McKnight*

Katherine L. McKnight, Bar #994456
Steven M. Dettelbach, Bar #440406
Alexander L. Reid, Bar #497396
Jonathan R. Barr, Bar #437334
Paul M. Levine, Bar # 999320
Caleb B. Acker, Bar #90003291
**BAKER & HOSTETLER LLP**
1050 Connecticut Avenue, Suite 1100
Washington, D.C. 20036
Telephone: 202.861.1500
Facsimile: 202.861.1783
kmcknight@bakerlaw.com
sdettelbach@bakerlaw.com
areid@bakerlaw.com
jbarr@bakerlaw.com
pmlevine@bakerlaw.com
cacker@bakerlaw.com

*Attorneys for Plaintiff Global Reach, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify on this 11th day of May 2026, I caused the foregoing Opposition to Defendant's Motion to Dismiss to be filed via the Court's CM/ECF, which will notify all counsel of record. I have also emailed the following emails associated with Defendants:

Robert Kent
Managing Member, Hawkwood Group LLC
10 Dove Trail
Candler, NC 28715
bob.kent@protonmail.com

John Furlow
Registered Agent, Hawkwood Group LLC
jfurlow@protonmail.com

Rolando Lopez
Hawkwood Group LLC
rlopez.hw@protonmail.com

*/s/ Katherine L. McKnight*