**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

GLOBAL REACH, INC.,

         Plaintiff,

         v.

HAWKWOOD GROUP LLC, *et al.*,

         Defendants.

Civil Action No. 26-cv-1394 (BAH)

Judge Beryl A. Howell

## MEMORANDUM OPINION

Plaintiff Global Reach, Inc., "a Washington, D.C. based nonprofit organization dedicated to bringing home Americans who are wrongly held abroad, whether by terrorist groups, criminal gangs, or foreign governments," brings a single claim for common-law tortious-interference with business, seeking both injunctive relief and damages, against defendant Hawkwood Group LLC ("HGL"), "a for profit business charging fees to the families of wrongfully detained Americans," and Robert Kent, its "Managing Member." Compl. ¶¶ 1, 6, ECF No. 1; Pl.'s Suppl. Mem. in Further Supp. of Its Mot. for Temporary Restraining Order ("TRO") ("Pl.'s Suppl. Mem."), Att. 2, Ex. 19, Email from Robert Kent, "Managing Member," HGL, to U.S. District Court for the District of D.C. (Apr. 27, 2026, 8:49:05 A.M.) ("First Kent Email"), ECF No. 18-2. This claim arises from defendants' ongoing conduct that allegedly is significantly frustrating efforts by plaintiff to fulfill an engagement to effectuate the return to the United States of Fabio Nicolas Espinal Nuñez, a U.S. citizen and private pilot, who, along with his co-pilot, Bradley Scott Schlenker, and their passenger, Kelton Mendonca Gama Reis, a Brazilian national, have been detained in Conakry, the Republic of Guinea, for over four months after they stopped to refuel the aircraft on a flight from Suriname to Dubai. Pl.'s Mot. for TRO ("Pl.'s Mot."), Att. 5, Decl. of plaintiff's Chief Engagement Officer, Stacia George ("George Decl.") ¶ 8, ECF No. 2-5; *id.*,

1

Att. 4, Decl. of plaintiff's Chief Investigative Officer, Kieran Ramsey ("Ramsey Decl.") ¶ 13-14, ECF No. 2-4; Pl.'s Suppl. Mem., Att. 6, Decl. of Fabio Nicolas Espinal Nuñez ("Nuñez Decl.") ¶¶ 2-4, ECF No. 18-6. Plaintiff has been engaged by Lauren Stevenson, Nuñez's fiancée, with Nuñez's full support, "to help return him legally to the United States from Guinea." Pl.'s Mot. ¶ 1; *see* Nuñez Decl. ¶ 12 ("I want Global Reach to assist my fiancé [sic] and work in support of my release. I am benefiting from Global Reach's efforts to help secure my safe and lawful release, and I am grateful for their efforts and services and support them. My entire family and their legal representation in the Dominican Republic is also supportive of these efforts from what I know."); *id.* ¶ 13 ("My fiancé [sic] is the named client, but my family and I are all staying informed to the extent possible, and we support Global Reach's efforts.").

Nuñez rejected defendants' offer, at a cost of $200,000, to assist in negotiating his release from Guinea, in favor of plaintiff's assistance. George Decl. ¶ 11; Ramsey Decl. ¶ 30; *see* Nuñez Decl. ¶ 12. Meanwhile, defendants have, apparently, been simultaneously retained by the co-pilot Schlenker's family and the purported unnamed owner of the private aircraft used for the flight to Guinea, with the apparent dual goals of securing Schlenker's release from Guinea and extracting monies claimed to be owed on the purchase of the aircraft by the passenger, Reis. George Decl. ¶ 10; Pl.'s Mot., Att. 10, Ex. 5, Letter from Robert Kent, "Authorized Representative (Proxyholder)," HGL, to Minister of Justice, Republic of Guinea (Mar. 26, 2026) ("Kent Mar. 26, 2026, Letter"), ECF No. 2-10 (transmission, dated March 26, 2026, by "Robert Kent Authorized Representative (Proxyholder). Hawkwood LLC," to Guinea's Court of Appeal, on letterhead of "Hawkwood, LLC," alleging Reis "fraudulently stole the aircraft placed under the control of your office" and identifying Kent as "the authorized legal representative and

attorney (POA) of the U.S. lawful owners of the aircraft . . . and the family of U.S. citizen Bradley Sott [sic] Schlenker.").

Plaintiff alleges that "[d]efendants' ongoing conduct, including communications to and about Nuñez, are tortiously interfering with Plaintiff's engagement." Pl.'s Mot. ¶ 2. As a result, plaintiff seeks a temporary restraining order directing that "Defendants shall cease and desist from interfering tortiously with Global Reach's business with the Nuñez family." *Id.* ¶ 7. Kent, who is proceeding *pro se*, opposes the motion and moves to dismiss the case "with prejudice" for lack of personal jurisdiction and improper venue. Def. Kent's Original Answer, Affirmative Defenses, & Mot. to Dismiss for Lack of Personal Jurisdiction & Improper Venue ("Def.'s Opp'n") at 5, ECF No. 15. For the reasons explained more fully below, plaintiff's motion for a temporary restraining order is **GRANTED** and Kent's motion to dismiss for lack of personal jurisdiction and improper venue is **DENIED**.

## I.      BACKGROUND

Set out below is the factual background followed by the procedural history for this case.

### A.      Factual Background

On December 30, 2025, two private pilots, Nuñez, a dual citizen of the United States and Dominican Republic, and Schlenker, a U.S. citizen, were detained in Conakry, Guinea, "after landing there to refuel on the way from Suriname to Dubai." Ramsey Decl. ¶ 13; *see* Compl. ¶¶ 25-26. "Nuñez and Schlenker were piloting a privately owned Gulfstream IV aircraft carrying a Brazilian national," Reis, along with his family, after Nuñez was hired as one of the pilots when he "respond[ed] to a solicitation on WhatsApp," without knowing of or having a relationship "with either Brad Schlenker or to the owner of the plane whose family were passengers." Ramsey Decl. ¶ 14; Nuñez Decl. ¶ 2. The "pilots and all passengers of the aircraft were arrested after landing in Guinea pursuant to charges that they did not have proper landing

3

permits," though the pilots "had an approved flight plan." Ramsey Decl. ¶ 15. Nuñez and Schlenker were interrogated for eight days and then "were sent to prison in Guinea on January 8th, 2026." Nuñez Decl. ¶ 5. They "remained in Prison until March 14th, 2026, when [they] were released from prison on bail and placed under an exit ban from Guinea." *Id.* They face three charges: (1) "Attack on the Sovereignty of the country"; (2) "Unauthorized entry to Guinean Airspace"; and (3) "Lack of a Landing Permit Number." *Id.* Nuñez and Schlenker maintain that "the proof of entry and ATC transcripts were provided by the Guinean Authorities, authorizing [them] to descent, perform a holding pattern, authorizing [them] to perform the approach to the active runway and consequently to land," and that they "were always in compliance with ATC during all phases of ground and in-flight." *Id.*

Following their detention by Guinean authorities, the pilots' families took steps to secure their release. They first "retained the legal services of Guinean attorney Jean-Baptiste Jocamey Haba ('Haba') as local defense counsel for both Nuñez and Schlenker on or about January 4, 2026." Ramsey Decl. ¶ 17. Around February 18, 2026, "Global Reach was initially contacted by Schlenker's family for assistance," leading to "multiple screening intake calls with the Schlenker family, including Schlenker's four siblings." *Id.* ¶ 18. Around March 2, 2026, plaintiff was advised that "Schlenker's brother had hired a private firm instead of Global Reach to secure the release of Schlenker" and would later learn that defendant HGL "was the private firm hired by the Schlenker family." *Id.* ¶ 19. HGL "is a Texas for-profit limited liability company that purports to conduct investigative operations and advertises personnel recovery, kidnap and ransom negotiations, recovery from unlawful state detention, and U.S. government contractor." Compl. ¶ 16. Plaintiff then "ultimately ceased communications with Schlenker's family as of March 11, 2026." Ramsey Decl. ¶ 20.

4

"On March 10, 2026, Global Reach was contacted by Nuñez's sister via [its] website requesting Global Reach's assistance on the same matter, specific to Nuñez." *Id.* ¶ 21.  On March 14, 2026, Nuñez was put in touch with plaintiff directly and reiterated "his desire to depart Guinea lawfully and safely without putting his future ability to travel internationally or his pilot's license at risk" because if Nuñez left without permission, "he could be subject to an INTERPOL Red Notice and be stopped at any international border." *Id.* ¶ 22.  On March 16, 2026, Nuñez's fiancée engaged plaintiff to help secure Nuñez's release. *Id.* ¶¶ 24-25; *see also* Nuñez Decl. ¶ 15 ("I am in an incredibly stressful and dangerous situation every day here. Global Reach and my family are working together trying to save me from that situation.  I fully support their efforts to do so.  I wish more than anyone that I could be personally present to inform an American Court of my wishes in person.  I cannot.  But I can express my views in writing.").  "[E]stablish[ing] a client relationship with a single family member of the person being detained" is plaintiff's "regular practice" because plaintiff "is rarely able to establish communication with the detainee, especially if the detainee is in prison or being held hostage." Pl.'s Suppl. Mem., Att. 8, Decl. of plaintiff's Chief Investigative Officer, Kieran Ramsey ("Second Ramsey Decl.") ¶ 17, ECF No. 18-8; *see* Nuñez Decl. ¶ 13 ("I am not free, and I have been held *incommunicado* for long periods since my arrest.  I understand that Global Reach needs to have a single decision maker as the client, who is not under or likely to be under duress and to whom they have access, to assist in getting me home.").

On the same day that Nuñez's fiancée formally engaged plaintiff, on March 16, 2026, Kent attempted to convince Nuñez in Guinea "that the 'price' for Nuñez's release was originally at $1 million and that Kent had negotiated with unspecified Guinean officials and settled on $200,000 with $160,000 for a 'fee' to Hawkwood, and $40,000 to the Guinean authorities."

George Decl. ¶ 11; *see* Ramsey Decl. ¶ 30.    On the insistence of Nuñez, plaintiff's representatives, Stacia George and Kieran Ramsey joined this call with Kent and "listened to this conversation."  Ramsey Decl. ¶ 30; *see* George Decl. ¶ 11.  Kent also "claimed (incorrectly) that the charges against the pilots had already been dropped and that they had been kept in prison and detained for this long due to the Guinean President and other government officials wanting to 'bleed' the families dry of funds."  George Decl. ¶ 11; *see* Ramsey Decl. ¶ 30.  "Kent continued to repeat that Hawkwood Group had secured agreements from senior Guinean government officials to return their passports and allow them to depart the country" and that they would be able to do so on March 18, 2026.  Ramsey Decl. ¶¶ 31-32.  This information proved false, and both pilots remain detained.  *See id.* ¶ 33; Pl.'s Opp'n to Kent's Mot. to Dismiss ("Pl.'s MTD Opp'n") at 12, ECF No. 21 ("[T]he message from Defendants was clear: once turned down by Mr. Nuñez as a paying client, they would take any action they could to interfere with Global Reach's *pro bono* efforts to secure Mr. Nuñez's release from Guinea.").

Following this conversation between Kent and Nuñez, the same day, on March 16, 2026, plaintiff tried to contact the CEO of HGL and received a call-back from this defendant's representative, identifying himself as "Holt," who "stated that Nuñez needed to stop listening to his attorneys and to go along with Hawkwood Group's plan to depart Guinea"; "that Schlenker's family contacted Hawkwood Group through an unidentified venture capitalist and Hawkwood Group was taking on the case because of Schlenker's family connection"; "that this issue started due to Reis and his father-in-law having 'stolen the plane' from a group of farmers who had a side-business involving private jets"; and that plaintiff "should 'stand down' on any further efforts for 24 hours."  Ramsey Decl. ¶¶ 34-35.  Holt also "negatively commented about leadership listed on the Global Reach website."  *Id.* ¶ 35.

6

Three days later, on March 19, 2026, Kent sent a letter to Reis's wife—what plaintiff refers to as the "Extortionist Letter"—demanding that she make millions of dollars in payments to defendants for restitution for the "stolen" plane and as the price to secure the release of everyone from Guinea and further threatening that if she failed to do so, Kent would report the plane as stolen to the Guinean and American authorities and that she must respond within an hour.  Pl.'s Mot., Att. 6, Ex. 1, Letter from Robert Kent to Cíntia Gisele Gama Reis (Mar. 19, 2026), ECF No. 2-6; Pl.'s MTD Opp'n at 7.  This letter made clear that Kent was hired to arrange Schlenker's repatriation and simultaneously was representing "the American owners of the aircraft . . . to recover and repatriate the aircraft."  Ramsey Decl. ¶ 37.  Nuñez was provided a copy of this letter by his attorney, who is from the Dominican Republic, and shared a copy with plaintiff.  *Id.* ¶ 36.

On March 22, 2026, once Nuñez changed locations to distance himself from Schlenker, Kent texted him, stating: "I can't believe you are trusting a corrupt Guinean attorney over a decorated US Military Officer.  You are an idiot."  *Id.* ¶ 39; *see also* Nuñez Decl. ¶ 14 ("I have moved multiple times while in Conakry to avoid Hawkwood and Bob Kent.").  The next day, March 23, 2026, Kent sent Nuñez's Dominican attorney a document, titled "Jocamey Avocats," accusing plaintiff of "ethically questionable" work with the Guinean attorney Haba, whose firm is Jocamey Avocats.  Pl.'s Mot., Att. 7, Ex. 2, document titled "Jocamey Avocats" at 3, ECF No. 2-7.  In this document, Kent alleges that Haba "has a financial interest in making the 'negotiation' last as long as possible, while Global Reach's presence makes it look like a high-level diplomatic effort is underway, which justifies the delay."  *Id.* at 3-4.  Notably, Haba had originally been hired by both Nuñez and Schlenker, on January 4, 2026, weeks before either family approached plaintiff.  Ramsey Decl. ¶ 17.  In context, defendants' impugning of the work

of Nuñez's attorneys and plaintiff strongly appears to be part of a pressure tactic to get Nuñez to hire defendants. In fact, plaintiff last had contact with Haba on March 20, 2026, and denies in sworn declarations that plaintiff "coordinated any specific action with Haba in its effort to help secure Nuñez's release, contrary to the false claims made in the 'Jocamey Avocats' document." George Decl. ¶ 15; Ramsey Decl. ¶ 43. In any event, "Mr. Nuñez has new counsel in Guinea." Pl.'s MTD Opp'n at 12.

On March 24, 2026, plaintiff's representative, who had traveled to Guinea to meet in person with Nuñez, witnessed Kent "verbally continue[] to pressure and threaten Nuñez to agree to participate in Kent's strategy requesting that he sign a document that would facilitate his release," using such tactics as "belittle[ing] Nuñez aggressively, calling him an 'idiot' multiple times, saying he would just 'leave him right here', and getting angry when Nuñez would ask questions about the plan." George Decl. ¶ 17. The document Kent was pressuring Nuñez to sign promised that Nuñez would "leave Guinean territory within 72 hours, after obtaining [his] passport" and would not "make any press conference or statement on Guinean territory after handling [his] travel documents." Pl.'s Suppl. Mem., Att. 7, Ex. 23, Commitment Letter (Mar. 24, 2026), ECF No. 18-7. Later that week, Kent threatened Nuñez that he "would turn Nuñez into the DEA and [] called him a 'Dominican cocksucker.'" George Decl. ¶ 18.

Kent's pressure campaign to have Nuñez work with defendants rather than plaintiff, persisted over the following days. On March 26, 2026, Kent texted Nuñez "that there 'is only one way out for you' and Reis, and that Reis 'has my terms if he changes his mind.'" Compl. ¶ 73. Kent continued trying to "threaten[] Nuñez's future in order to pressure Nuñez to support payments to Hawkwood Group," *id.* ¶ 74, by sending the message "Next time you talk with your wife, let her know that I am working with the Embassy and the FAA. I am also going to contact

the DEA, because we were able to implicate the plane in trafficking operations all over Mexico, South, and Central.  And just to be a dick, Im [sic] going to send all my all of my [sic] reports to Delta," Pl.'s Mot., Ex. 3, Text Message, Robert Kent to Fabio Nicolas Espinal Nuñez (Mar. 26, 2026, 2:42 P.M.) ("Kent Mar. 26, 2026, Text Message"), ECF No. 2-8.  The next day, March 27, 2026, Nuñez received a text message from "Schlenker, while under the influence of Kent, . . . containing a Bible verse stating something to the effect of 'the wicked will be punished,' which Nuñez took to be a thinly veiled threat against him."  Ramsey Decl. ¶ 45.

By early April, the legal resolution sought by Nuñez to the ordeal was in sight: "on April 3, 2026, Reis, Nuñez, and Schlenker were approved to leave the country while their trial continued after a ten working-day period passed allowing for any appeals," meaning that "[i]f no appeals were filed, Nuñez would be permitted to lawfully depart Guinea after the ten working-day period ended on April 17, 2026."  Ramsey Decl. ¶ 46; *see* Pl.'s Mot., Att. 9, Ex. 4, Guinean Order Granting Partial Lifting of Judiciary Control Measures (Apr. 3, 2026) ("Apr. 3 Guinean Judicial Order"), ECF No. 2-9.  Yet, before that ten-day period lapsed, defendants filed a request with Guinean authorities to continue the detention of Reis in pursuit of obtaining monies on behalf of their unnamed client that were purportedly owed by Reis for purchase or lease of the aircraft.  Specifically, on April 7, 2026, a letter signed by Kent was filed with the Guinean court "triggering an appeal."  Ramsey Decl. ¶ 47.  This letter, dated March 26, 2026, from Kent to the Guinea Minister of Justice, made "a formal request for the immediate detention of Ketton [sic] Reis and the securing of the assets pending full restitution."  Kent Mar. 26, 2026, Letter; George Decl. ¶ 22 ("Kent through a local lawyer had filed an appeal asking that the Brazilian passenger be detained until the Brazilian paid Hawkwood and Schlenker a combined total of $1.9 million. As a result, the approval to leave was put on hold.").

9

Then, in early April 2026, an account on the platform X, formerly known as Twitter, with the handle "@BradPoa" made its first appearance. Ramsey Decl. ¶ 48. In a tweet, dated April 8, 2026, defendants, using the handle @BradPoa, posted an article entitled "*The Conakry Trap: Corporate Narcos, a Stolen Gulfstream, and the Betrayal of an American Pilot.*" *Id.*[1] According to plaintiff, this article, which is not in the record, stated that "co-pilot Fabio Espinal Nuñez is reportedly working in coordination with the Reis family and their local attorneys—including the controversial Maître Abdourahamane Dabo and Maître Jean-Baptiste Jocamey Haba—to frame Schlenker for the 'unauthorized' flight, effectively making him the fall guy for the international theft." *Id.* ¶ 48.[2] Unfortunately, this post, which not only impugned Nuñez's attorneys but also

[1]    Plaintiff identified the user of the handle "BradPoa" as defendants for several reasons, including that (1) the handle appeared to refer to Brad Schlenker's "power of attorney"; (2) the posts refer to Schlenker in the third-person, as if written by another person; and (3) the language of the texts echo that used by Kent in his communications. Pl.'s Statement of P. & A. in Supp. of Its Mot. for TRO ("Pl.'s Mem.") at 4, ECF No. 2-1; Ramsey Decl. ¶ 48 ("Schlenker's post is written in the third person under handle '@BradPoa,' possibly standing for 'power of attorney . . . .'"); *see also* TRO Hr'g (May 1, 2026) Tr. at 25:25-26:2 (Plaintiff's counsel: "[T]hen the odd handle 'Poa,' it's almost, like, a power of attorney."). Any doubt that defendants authored the posts using the handle "@BradPoa" is resolved by defendants' own admission in Kent's most recent *pro se* filing, stating that plaintiff "attempts to establish personal jurisdiction in the District of Columbia based solely on Defendants' social media activity," Def.'s Am. Mot. to Dismiss for Lack of Personal Jurisdiction in Opp'n to Pl.'s Mot. for a TRO ("Def.'s Am. Opp'n") at 1, ECF No. 19, when that activity is only posts by "@BradPoa." Consequently, the handle @BradPoa is indisputably controlled by defendants.

[2]    Plaintiff posits that defendants' allegation about Nuñez and Reis working together in any capacity other than the single trip for which Nuñez was hired with Schlenker to pilot a private plane, is a "false claim," Pl.'s Mem. at 19, and indeed, no evidence other than defendants' bald allegations in communications they authored supports that allegation. In a sworn declaration, Nuñez states that "[p]rior to responding to a WhatsApp posting about co-piloting a flight from Suriname to Dubai," he "had no knowledge of or relationship with . . . the owner of the plane whose family were passengers." Nuñez Decl. ¶ 2. Additionally, plaintiff completed a due diligence process before agreeing to represent Nuñez, involving "multiple screening intake calls," communication with the U.S. State Department to collect more information, and "additional deliberation" before making "the assessment that Nuñez was wrongfully detained." Ramsey Decl. ¶¶ 21, 24. Both families retained Haba as "local defense counsel for both Mr. Nuñez and Mr. Schlenker" on around January 4, 2026, well before either plaintiff became involved. Pl.'s MTD Opp'n at 2. Tellingly, defendants' claim of cooperation between Nuñez and Reis arose only after Nuñez declined to hire defendants at a cost of $200,000. Ramsey Decl. ¶¶ 30, 48. Plaintiff emphasizes that defendants are playing multiple sides: working for Schlenker, trying to get Nuñez to pay money to defendants, working for unnamed client(s) who want payments for the plane, and attempting to coerce payments from the Reis family. Pl.'s Mem. at 16; *see also* Pl.'s MTD Opp'n at 4 ("Defendants have also taken on multiple clients in this matter with conflicting interests, and have allowed those conflicts to drive actions that have injured Global Reach and its client."); *id.* at 9 ("Now Kent was even working for the supposed plane owners, willing to leverage their interest to the detriment of those stuck in Conakry."). In this morass of seemingly conflicted interests, defendants may somehow believe spurious allegations about Nuñez working with Reis in criminal activities advances one or more of these interests, though that strategy has failed so far to achieve any success for anyone involved.

the Guinean legal system, was apparently reviewed by Guinean authorities. "Nuñez was directly advised by the prosecutor on April 13, 2026, that the recent appeal filed by the prosecutor's office was due, in part, to the recent social media posts made by Schlenker which criticized the government and justice system of Guinea." *Id.* ¶ 49; *see also* Pl.'s Mot., Att. 11, Ex. 6, Letter, Lic. César V. Polanco Reynoso, Att'y at L., to plaintiff (Apr. 13, 2026) ("Reynoso Letter"), ECF No. 2-11 (Nuñez's attorney: "The judicial authorities informed us that the grounds for the appeal currently under consideration are specifically linked to a series of publications issued by Mr. Bradley Scott Schlenker via the X (formerly Twitter) account @BradPoa, which was created and verified in early April. . . .  In our consultations, the authorities indicated that the aforementioned video primarily consists of criticisms directed at the Government of Guinea, its authorities, and legal professionals within both Guinea and the United States.").

Despite the setback to the anticipated release of Nuñez due to the Guinean prosecutor's appeal of the April 3 Guinean Judicial Order, which appeal was apparently triggered by defendants' April 7 court filing and defendants' April 8, 2026 tweet, defendants persisted in the same vein.  On April 13, 2026, defendants, using the same X account with the handle @BradPoa, posted another article, titled "*The Fight for Brad Schlenker: Corruption, Containment, and a Race Against Time in Guinea*," that includes an allegation that "[a] Dominican attorney known as 'Cesar,' representing the co-pilot, arrives and begins coordinating with Kelton Reis' corrupt local counsel."  Pl.'s Suppl. Mem., Att. 4, Ex. 21, @BradPoa, X (Apr. 13, 2026, 11:24 A.M.) ("Apr. 13, 2026, *Fight for Brad Schlenker*"), ECF No. 18-4.  The article highlights the allegation that Reis acquired the Gulfstream, with a $500,000 deposit, before the jet "effectively vanish[ed]" until landing in Conakry on December 30, 2025, and then goes on to describe Schlenker's detention as due to "a 'shadow state' patronage network—an informal system

11

through which elements of Guinea's military, judiciary, and legal profession collaborate to extract money from foreign nationals through prolonged detention." *Id.*  This post was not only publicly accessible to any user on X, but also "tagged"—meaning that the post was directed or pushed to certain other X accounts—to multiple Washington, D.C.-based officials and institutions, including the President, the White House, the Secretary of State, the State Department, and the Director of the FBI.  Pl.'s Suppl. Mem., Ex. 22 ("Apr. 13, 2026, Tweetstorm"), ECF No. 18-5.

Defendants' conduct did not abate with the filing of this lawsuit on April 23, 2026.  On the very next day and, in apparent response to the complaint, the @BradPoa account posted that "[a]n elite DC consulting firm and a DC law firm have been hired to assist Kelton Reis and Fabio Nunez and stymie our investigation into the stolen plane and the alleged Reis organization links to narcotics cartels.  Why are the DC elite helping an alleged Brazilian narcotics trafficker and a Dominican co-pilot shift the blame to Brad, and use the stolen plane to effectuate their release?" Pl.'s Reply Mem. in Further Supp. of Its Mot. for TRO ("Pl.'s Reply"), Att. 2, Ex. 16 @BradPoa, X (Apr. 24, 2026, 1:14 P.M.) ("Apr. 24, 2026, Tweet"), ECF No. 17-2.  A series of nearly identical tweets were posted tagging, *inter alia*, media outlets, including the Wall Street Journal, Newsmax, Fox News, and One America News Network, as well as federal officials and agencies headquartered in Washington, D.C., including Secretary of State Marco Rubio, the Assistant Secretary of the Air Force, the Drug Enforcement Agency, the White House, the White House Rapid Response Team, the FBI Director, various U.S. Senators, and the United States Attorney for the District of Columbia.  *Id.*

Four days later, on April 28, 2026, defendants posted an article on the @BradPoa account titled "*The Cost of the Accord: How a Dying American Pilot Became the Inconvenient Ghost in*

*the Machine of Washington's New Mineral Diplomacy*," repeating the allegation made earlier in defendants' April 8, 2026 tweet about the existence of a "shadow state" within Guinea of "a patronage network of high-ranking officials and judicial actors who treat foreign investors as ATMs" that is the result of "the opaque legal system of a nation currently navigated by a transitional military government."  Pl.'s Reply, Att. 3, Ex. 17 @BradPoa, X (Apr. 28, 2026, 1:25 P.M.) ("Apr. 28, 2026, *The Cost of the Accord*"), ECF No. 17-3.  The article goes on to say that critical minerals have turned Guinea into "a focal point of the Trump administration's evolving global strategy" and, as a consequence, "a D.C. establishment firm and the U.S. State Department seem so hesitant" to intervene in the pilots' detention.  *Id.*  Thus, "to smooth over rather than resolve" diplomatic frictions, a "D.C. nonprofit has accused Schlenker's representatives of 'tortious interference,' claiming that efforts to recover the stolen aircraft and expose the corruption of the Guinean 'shadow state' have sabotaged the co-pilot's release," and "[b]y insisting the pilots are co-defendants, the D.C. firm effectively tethers the innocent Schlenker to the fate of a crew potentially compromised by a suspected trafficker."  *Id.*  Tweets containing this article tagged, *inter alia*, media outlets (*i.e.* Fox News, One American News Network, and CBS News) and, again, federal officials and agencies headquartered in Washington, D.C., including the White House, the White House Press Secretary, the Director of the White House Presidential Personnel Office, the State Department, the State Department Spokesperson, the FBI Director, and a U.S. Senator.  Pl.'s Reply, Att. 4, Ex. 18 ("Apr. 28, 2026, Tweetstorm"), ECF No. 17-4.

Plaintiff's Chief Investigative Officer traveled to Guinea "to help ensure Mr. Nuñez's safety from Defendants," leaving for Guinea on April 25 and returning home on May 1, 2026. Second Ramsey Decl. ¶ 8.  Nuñez continues to adamantly oppose defendants' involvement in his

case.  Nuñez Decl. ¶ 14 ("I do *not* want assistance from the Hawkwood Group or Bob Kent.  In fact, I would prefer that they leave me alone, stop harassing me, stop contacting me, stop threatening me, stop falsely accusing me of multiple wrongdoings, stop asking me for money, and stop pitting me against Brad Schlenker (who I believe is also being wrongfully detained)." (emphasis in original)).

### B.     Procedural History

Plaintiff filed the instant suit on April 23, 2026, *see* Compl., and simultaneously moved for the pending temporary restraining order, *see* Pl.'s Mot.  According to plaintiff, defendants were taking "active and intentional steps to interfere with" plaintiff's efforts to secure the release of Nuñez, including "spreading false information about Plaintiff, engaging in bad acts and threatening tactics, and taking steps that have actually prolonged the detention of Nuñez and thereby frustrated Plaintiff's efforts to achieve its mission for Nuñez, all because Nuñez turned them down to work with Plaintiff, and Defendants want to pocket a hefty sum for 'work' they claim will secure the release of Nuñez's colleague, another pilot, Bradley Scott Schlenker." Compl. ¶¶ 7, 9.  Critically, in plaintiff's view and that of Nuñez, defendants' actions are "directly prolonging Nuñez's detention in Guiana." *Id.* ¶ 105; *see also* Nuñez Decl. ¶ 15 ("I just want to be able to go home, and Hawkwood and Bob Kent are making that far more difficult.  I believe that they have been harming Global Reach's efforts to assist in getting me back home to my family. . . .   I fully support any action that could rid Global Reach from any continued interference by Hawkwood and Kent in their efforts to get me back home.").

The case was randomly assigned to the undersigned on April 24, 2026, and the parties were directed to meet and confer to submit a proposed briefing schedule on the pending TRO motion.  *See* Minute Order (Apr. 24, 2026).  In response, plaintiff described in detail the efforts undertaken to meet and confer with defendants, who, at that time, had not responded to four

14

emails sent between April 23, 2026, and April 24, 2026, to FedEx delivery of the filings to HGL's business address and Kent's residence, or to phone calls to HGL's registered agent, a licensed attorney in Texas.  Pl.'s Not. Regarding Efforts to Meet & Confer with Defs. & Setting of Briefing Schedule, ECF No. 8.  Plaintiff requested a hearing on May 1, 2026, "or as soon thereafter as the Court is available to do so." *Id.*  The parties were directed to comply with a highly expedited briefing schedule, with any opposition by defendants to be filed by April 28, 2026. *See* Minute Order (Apr. 24, 2026).

On April 27, 2026, Kent, proceeding *pro se* and purporting to represent HGL sent, via email, to the Clerk of Court, an answer to be filed that raised ten affirmative defenses and sought dismissal of plaintiff's motion and the complaint "with prejudice."  *See* Def.'s Opp'n at 5.[3] Affidavits of Service were filed for both defendants on April 29, 2026, *see* Return of Service/Affidavit, ECF Nos. 13, 14 (showing HGL had been served on April 25, 2026, and Kent on April 27, 2026).  In accord with plaintiff's request, a TRO hearing was scheduled for May 1, 2026. *See* Minute Order (Apr. 29, 2026).

Thirty minutes before the scheduled hearing, Kent sent a second email to the Clerk of the Court, with a document styled as an amended filing.  *See* Pl.'s Suppl. Mem., Att. 3, Ex. 20, Email from Robert Kent, Managing Member, HGL, to U.S. District Court for the District of D.C. (May 1, 2026, 10:31:41 A.M.) ("Second Kent Email"), ECF No. 18-3; *see also* Def.'s Am. Mot. to Dismiss for Lack of Personal Jurisdiction in Opp'n to Pl.'s Mot. for a TRO ("Def.'s Am.

---

[3]     In conformity with the Clerk of Court's instructions, *see* U.S. District Court for the District of Columbia, Email Filing Procedures for Unrepresented Parties, https://www.dcd.uscourts.gov/sites/dcd/files/ ProSeEmailingInstructions.pdf, Kent sent this motion, via email, to the Court's Clerk's Office, at email address dcd_intake@dcd.uscourts.gov, on Monday, April 27, 2026, at 8:49 A.M., *see* First Kent Email.  Although the Clerk's Office designated the motion on the public docket as having been filed on April 27, 2026, which is the date Kent's email was received in the Clerk's Office, the motion was not entered onto the docket, and thus made accessible to the Court, until Wednesday, April 29, 2026, at 11:53 A.M.

Opp'n"), ECF No. 19.[4]   Neither Kent nor any representative for HGL appeared at the TRO hearing.  *See* TRO Hr'g (May 1, 2026) Tr. at 2:18-19 (Court: "For the record, [Robert Kent] is not here; nor is there any representative for the other defendant, Hawkwood Group, LLC.").  The evolving nature of the dispute coupled with the jurisdictional complexities presented by the case raised issues not directly addressed in the emergency briefing, prompting plaintiff's counsel to "offer that for every factual question you have today that I do not have an answer for, we commit to getting you an affidavit that provides answers."  Hr'g Tr. 15:6-8.  The next business day, on May 4, 2026, plaintiff supplemented its motion "to address questions raised by the Court during the May 1, 2026, Hearing."  Pl.'s Suppl. Mem. at 1.

Kent's two *pro se* filings read together assert that that "[v]enue is improper," Def.'s Opp'n at 2, that this Court's "exercise of personal jurisdiction would violate the Due Process Clause of the United States Constitution," *id.*; Def.'s Am. Opp'n at 1 ("[T]his Court lacks personal jurisdiction over the Defendants."), and "challenge[s] that this Court has *any* jurisdiction over this matter," Def.'s Opp'n at 2 (emphasis added)).  *See Kim v. United States*, 840 F. Supp. 2d 180, 185 (D.D.C. 2012) (CKK) ("[W]here a *pro se* party has filed multiple submissions, the district court must generally consider those filings together and as a whole.").  Given that *pro se* filings must be given "liberal[] constru[ction]" in raising a challenge to subject matter jurisdiction, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)), these *pro se* filings are construed as seeking dismissal of the complaint under Federal Rules of Civil Procedure 12(b)(1), (b)(2), and (b)(3).  Late in the

---

[4]      Kent sent his amended motion to the Court's Clerk's office on May 1, 2026, at 10:31 A.M., *see* Second Kent Email, and although the Clerk's office designated on the public docket that the amended motion was filed on Friday, May 1, 2026, which is the date Kent's email was received in the Clerk's Office, the amended motion was not entered onto the docket and thus made accessible to the Court, until Tuesday, May 5, 2026, at 2:04 P.M., well after the conclusion of the TRO hearing.

evening on May 11, 2026, plaintiff filed an opposition to Kent's motion to dismiss. *See* Pl.'s MTD Opp'n.

Plaintiff's motion for a TRO and defendants' motion to dismiss are now ready for resolution.

## II. LEGAL STANDARD

The legal standards governing Kent's challenges seeking dismissal of the complaint are reviewed before the legal standards controlling plaintiff's motion for a temporary restraining order.

### A. Dismissal for Lack of Jurisdiction and Improper Venue

"Article III of the Constitution prescribes that '[f]ederal courts are courts of limited subject-matter jurisdiction' and 'ha[ve] the power to decide only those cases over which Congress grants jurisdiction.'" *Bronner ex rel. Am. Stud. Ass'n v. Duggan*, 962 F.3d 596, 602 (D.C. Cir. 2020) (alterations in original) (quoting *Al-Zahrani v. Rodriguez*, 669 F.3d 315, 317 (D.C. Cir. 2012)). "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." FED. R. CIV. P. 12(h)(3).

When considering a motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), the court must determine jurisdictional questions by accepting as true all uncontroverted material factual allegations contained in the complaint and "'constru[ing] the complaint liberally, granting plaintiff[s] the benefit of all inferences that can be derived from the facts alleged.'" *Hemp Indus. Ass'n v. DEA*, 36 F.4th 278, 281 (D.C. Cir. 2022) (second alteration in original) (quoting *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011)). In other words, the court "must assume that [the plaintiff] states a valid legal claim," *Info. Handling Servs., Inc. v. Def. Automated Printing Servs.*, 338 F.3d 1024, 1029 (D.C. Cir. 2003), and must "accept the well-pleaded factual allegations as true and draw all reasonable

17

inferences from those allegations in the plaintiff's favor," *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "[T]he district court may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction . . . ."  *Jerome Stevens Pharms., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(2), plaintiffs bear the burden of "establishing a factual basis for the [Court's] exercise of personal jurisdiction over the defendant."  *Crane v. N.Y. Zoological Soc'y*, 894 F.2d 454, 456 (D.C. Cir. 1990).  In considering such a motion "without an evidentiary hearing, a court ordinarily demands only a prima facie showing of jurisdiction by the plaintiffs."  *Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005); *see also Second Amend. Found. v. U.S. Conf. of Mayors*, 274 F.3d 521, 524 (D.C. Cir. 2001) (stating as "[t]he general rule . . . that a plaintiff must make a *prima facie* showing" for personal jurisdiction (ellipsis in original) (quoting *First Chi. Int'l v. United Exch. Co.*, 836 F.2d 1375, 1378 (D.C. Cir. 1988))).  "Conclusory statements . . . '[do] not constitute the *prima facie* showing necessary to carry the burden of establishing personal jurisdiction.'"  *First Chi. Int'l*, 836 F.2d at 1378 (alteration in original) (quoting *Naartex Consulting Corp. v. Watt*, 722 F.2d 779, 787 (D.C. Cir. 1983)).

Under Federal Rule of Civil Procedure 12(b)(3), a party may move to dismiss a case for "improper venue."  FED. R. CIV. P. 12(b)(3).  The federal venue statute requires that a district court "dismiss, or if it be in the interest of justice, transfer" a case filed "in the wrong division or district."  28 U.S.C. § 1406(a).  The decision whether to transfer or dismiss "rests within the sound discretion of the district court."  *Naartex*, 722 F.2d at 789.  Whether "venue is 'wrong' or 'improper' depends exclusively on whether the court in which the case was brought satisfies the

requirements of federal venue laws." *Atl. Marine Constr. Co., Inc. v. U.S. Dist. Ct.*, 571 U.S. 49, 55 (2013).

### B.    Necessary Showing for Temporary Restraining Order

Much like a preliminary injunction, a temporary restraining order is "an extraordinary remedy that should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (quoting *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004)). "The standard for obtaining either a TRO or a preliminary injunction is identical." *Dellinger v. Bessent*, No. 25-5028, 2025 WL 559669, *3 (D.C. Cir. Feb. 15, 2025) (citing *Gordon v. Holder*, 632 F.3d 722, 723-24 (D.C. Cir. 2011)). Thus, to obtain a temporary restraining order "the movant must show: (1) 'he is likely to succeed on the merits,' (2) 'he is likely to suffer irreparable harm in the absence of preliminary relief,' (3) 'the balance of equities tips in his favor,' and (4) issuing 'an injunction is in the public interest.'" *Hanson v. District of Columbia*, 120 F.4th 223, 231 (D.C. Cir. 2024) (per curiam) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)); *see Gordon*, 632 F.3d at 723-24 (applying the preliminary injunction standard to review a district court decision denying a motion for a temporary restraining order and preliminary injunction).

While the standard is the same for a TRO and a preliminary injunction, other aspects of these two forms of emergency relief differ. Specifically, a "TRO often is used to provide immediate relief upon the filing of a lawsuit and may be issued without notice to the adverse party," *Dellinger*, 2025 WL 559669, at *3 (citing FED. R. CIV. P. 65(b)(1)), and "'expires at the time after entry—not to exceed 14 days—that the court sets, unless before that time the court, for good cause, extends it for a like period or the adverse party consents to a longer extension,'" *id.* (quoting FED. R. CIV. P. 65(b)(2)), beyond which "timeframe of a TRO, the district court may grant a preliminary injunction to provide relief that extends until the lawsuit is resolved," *id.*

## III.    DISCUSSION

Analysis will proceed in three parts.  First, given Kent's misapprehension that he may somehow represent his co-defendant in this action, clarification is required about both HGL's lack of appearance in this action and the consequences of that choice by this limited liability company.  Second, Kent's *pro se* motion to dismiss the complaint, as amended, is addressed, since the jurisdictional and venue grounds raised in his brief three-page *pro se* filing require resolution as part of consideration of plaintiff's requested TRO.  Finally, the four factors necessary for a TRO are analyzed to find that plaintiff is entitled to the requested relief.

### A.    HGL Has Not Entered an Appearance

In Kent's filings in this matter, he indicates that he is "appearing pro se" and representing both himself and HGL.  Def.'s Opp'n at 1; *see* Def.'s Am. Opp'n at 1.  Of course, Kent, a non-lawyer, is permitted to appear on his own behalf.  *See* 28 U.S.C. § 1654 ("In all courts of the United States the parties may plead and conduct their own cases personally or by counsel as, by the rules of such courts, respectively, are permitted to manage and conduct causes therein."), but he is not permitted to appear on behalf of HGL for two reasons.  First, no matter his connection to the company, an individual who is not an attorney cannot appear *pro se* and seek to represent others, but may only represent himself.  *United States ex rel. Feliciano v. Ardoin*, 127 F.4th 382, 392 (D.C. Cir. 2025) (per curiam); *see also Tracy v. Kratovil*, 798 F. App'x. 665, 665 (D.C. Cir. 2020) (per curiam) (holding that the plaintiffs could not seek relief on behalf of their business, because "it is not permissible for a party who 'is not a member of the bar of any court . . . to appear . . . as counsel for others.'" (quoting *Georgiades v. Martin-Trigona*, 729 F.2d 831, 834 (D.C. Cir. 1984)).

Second, HGL is an "artificial entity" and thus may only appear in court with representation by licensed counsel, and Kent does not qualify as such.  *Am. Airways Charters,*

*Inc. v. Regan*, 746 F.2d 865, 873 n.14 (D.C. Cir. 1984).  The Supreme Court has made clear that "[i]t has been the law for the better part of two centuries, . . . that a corporation may appear in the federal courts only through licensed counsel. . . .  As the courts have recognized, the rationale for that rule applies equally to all artificial entities."  *Rowland v. Cal. Men's Colony, Unit II Men's Advisory Council*, 506 U.S. 194, 201-02 (1993); *see also Am. Airways Charters*, 746 F.2d at 873 n.14 ("[I]t is established that a corporation, which is an artificial entity that can only act through agents, cannot proceed *pro se*." (internal quotation marks and citations omitted)); *Diamond Ventures, LLC v. Barreto*, 452 F.3d 892, 900 (D.C. Cir. 2006) (similar); *Bristol Petroleum Corp. v. Harris*, 901 F.2d 165, 166 n.1 (D.C. Cir. 1990) (similar); *1756 W. Lake St. LLC v. Am. Chartered Bank*, 787 F.3d 383, 385 (7th Cir. 2015) ("[A] limited liability company, like a corporation, cannot litigate pro se or be represented in the litigation by a nonlawyer."); *Nawa USA, Inc. v. Hans-Georg Bottler*, No. 06-cv-1150 (RMC), 2007 WL 9760472, at *1 (D.D.C. Feb. 26, 2007) (striking from docket motion to dismiss filed *pro se* by corporate defendant since "[a] corporation can appear only through a licensed attorney.").

Despite HGL being served and having sufficient notice of the pending TRO motion to put forward Kent, identifying himself as its "Managing Member," to assert the company's position, this company has so far failed to enter an appearance through a licensed attorney.  Moreover, this company has failed to file, through the requisite licensed counsel, any opposition, timely or otherwise, to the pending TRO motion.  Consequently, "the Court may treat the motion as conceded" as far as plaintiff's motion pertains to HGL.  *See* D.D.C. Local Civil Rule 7(b).  Nevertheless, judicial economy is not substantially furthered by treating the motion as conceded as to HGL since the jurisdictional and venue challenges raised by Kent must still be addressed and plaintiff must still satisfy all four elements requisite for a TRO to be granted.

21

**B.      Jurisdiction Is Properly Exercised in This Case and Venue Is Proper in This Court**

Kent's barebones challenges to both subject matter and personal jurisdiction are addressed first before turning to his venue challenge.

### 1. Diversity Jurisdiction

Plaintiff invokes federal diversity jurisdiction and must therefore establish complete diversity between the parties and an amount in controversy in excess of $75,000.  *See* 28 U.S.C. § 1332(a).  Complete diversity is readily satisfied because plaintiff is "organized under the laws of Delaware with its principal place of business in Washington, D.C.," Compl. ¶ 22, while HGL has its principal place of business in Texas—as shown by publicly accessible State of Texas records, including federal tax liens filed against this entity in Denton County, Texas in 2025— and Kent maintains his residence in North Carolina, *see* Compl. ¶¶ 16, 19; Pl.'s Mot., Ex. 10, Not. of Fed. Tax Lien Instrument No. 2220 (recorded Jan. 8, 2025), ECF No. 2-15; Pl.'s Mot., Ex. 11, Not. of Fed. Tax Lien Instrument No. 62194 (recorded June 6, 2025), ECF No. 2-16; Pl.'s Mot., Ex. 12, Not. of Fed. Tax Lien Instrument No. 106819 (recorded Sept. 23, 2025), ECF No. 2-17; Pl.'s Mot., Ex. 13, Not. of Fed. Tax Lien Instrument No. 133441 (recorded Nov. 26, 2025), ECF No. 2-18; *see also* Def.'s Opp'n at 2 ("Defendants are residents of the States of Texas, and North Carolina with its principal place of business in Texas and does not reside in, maintain offices, or own property in, or regularly conduct business in the District of Columbia.").[5]

---

[5]      Plaintiff points to these tax liens and other debt obligations showing HGL's financial distress as animating defendants' aggressive pressure tactics aimed at obtaining money from Nuñez.  *See* Pl.'s MTD Opp'n at 4 ("Defendants, facing significant financial distress, have taken their pay-to-release model to the extreme by pressuring and threatening Mr. Nuñez to retain them and then needlessly attacking Mr. Nuñez and Global Reach after he did not, thereby interfering with Global Reach's lawful relationship serving its client (Mr. Nuñez's fiancé) that would already have been successful in bringing Mr. Nuñez home absent Defendants' actions.").

As for the amount in controversy, plaintiff has submitted a declaration detailing $94,808.37 in expenses incurred between March 15, 2026, and May 2, 2026, "as a result of Defendants' interference with Global Reach's efforts to secure the lawful and safe release" of Nuñez. Second Ramsey Decl. ¶¶ 2, 11 tbls.1, 2. The same declaration "anticipate[s] **at least $50,000** in more time and expenses" to secure Nuñez's release, none of which "should have been necessary because Mr. Nuñez should be home." *Id.* ¶ 12 (emphasis in original). Plaintiff has thus established an amount in controversy in excess of $75,000 and made the requisite showing for diversity jurisdiction. Accordingly, Kent's challenge to this Court's subject matter jurisdiction over this matter fails.

### 2. Personal Jurisdiction Over Defendants

Kent contends that "the Complaint should be dismissed for lack of personal jurisdiction." Def.'s Am. Opp'n at 2. This case arises under the Court's diversity jurisdiction, *see supra* Part III.B.1, and thus whether personal jurisdiction may be exercised over defendants is a function of District of Columbia law. *N.Y. Zoological Soc'y*, 894 F.2d at 455; *Crane v. Carr*, 814 F.2d 758, 762 (D.C. Cir. 1987). Since defendants are indisputably not residents of the District, personal jurisdiction may be exercised over them only if "(1) jurisdiction is authorized under the District's long-arm statute, and (2) [] such an exercise of jurisdiction comports with the Due Process Clause." *Media Matters for Am. v. Paxton*, 138 F.4th 563, 574 (D.C. Cir. 2025) (citing *Urquhart-Bradley v. Mobley*, 964 F.3d 36, 43 (D.C. Cir. 2020)). The District's long-arm statute provides that "[a] District of Columbia court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's" conduct in various ways that qualify as contacts with this District. D.C. Code § 13-423(a). Here, plaintiff invokes three of those ways provided in the long-arm statute: "(1) transacting any business in the

District of Columbia; . . . ; (3) causing tortious injury in the District of Columbia by an act or omission in the District of Columbia; [and] (4) causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia if he regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia." *Id.*; *see* Compl. ¶ 23 (invoking D.C. Code § 13-423(a)(4)); Pl.'s Reply at 8-12 (invoking D.C. Code § 13-423(a) (1), (3) and (4)).

Plaintiff contends that personal jurisdiction is satisfied under D.C. Code § 13-423(a)(1), *see* Pl.'s Reply at 8, "which authorizes jurisdiction to the full extent allowed by the Due Process Clause" and, consequently, "the statutory and constitutional inquiries merge," *Paxton*, 138 F.4th at 576 (citing *Mills v. Anadolu Agency NA, Inc.*, 105 F.4th 388, 395-96 (D.C. Cir. 2024)). The D.C. Circuit has emphasized that, under subsection (a)(1), jurisdiction "is limited to claims arising from the particular transaction of business in the District." *World Wide Mins., Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1168 (D.C. Cir. 2002) (internal quotation marks and citation omitted); *accord Li v. Li*, No. 23-7052, 2024 WL 4601521, at *2 (D.C. Cir. Oct. 29, 2024) (per curiam) (quoting *World Wide Mins.*, 296 F.3d at 1168).

"[D]ue process is satisfied 'if there are minimum contacts between the defendant and the forum state such that the defendant should reasonably anticipate being haled into court there,'" so, "[i]n other words, the defendant must have 'purposefully availed himself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" *Paxton*, 138 F.4th at 576 (quoting *Urquhart-Bradley*, 964 F.3d at 44, and *Thompson Hine, LLP v. Taieb*, 734 F.3d 1187, 1189 (D.C. Cir. 2013)). Such "minimum contacts exist where a defendant takes intentional, and allegedly tortious, actions expressly aimed at a

jurisdiction." *Id.* (quoting *Urquhart-Bradley*, 964 F.3d at 48). "Once it has been decided that a defendant purposefully established minimum contacts within the forum State, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice.'" *Id.* (quoting *Burger King v. Rudzewicz*, 471 U.S. 462, 476 (1985)); *see GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1347 (D.C. Cir. 2000) ("[A] plaintiff must show 'minimum contacts' between the defendant and the forum establishing that 'the maintenance of the suit does not offend traditional notions of fair play and substantial justice.' Under [this] standard, courts must insure that 'the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there.'" (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945), and *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980))).

The Supreme Court has elaborated on one method of establishing the requisite minimum contacts in the forum by an out-of-state defendant, whose actions were intended to have the claimed harmful effects on the plaintiff inside the forum, that is highly pertinent here. In *Calder v. Jones*, 465 U.S. 783 (1984), the Supreme Court considered whether a California court had personal jurisdiction over Florda residents for a libel suit filed by a California resident, who claimed that "that she had been libeled in an article written and edited by petitioners in Florida" when the article had been "published in a national magazine with a large circulation in California." *Id.* at 784. Neither of the Florida defendants' "contacts with California would be sufficient for an assertion of jurisdiction on a cause of action unrelated to those contacts," *id.* at 786-87, but the Supreme Court nonetheless concluded that the publication of the libelous article supported the exercise of personal jurisdiction over those out-of-state residents. Reasoning that "[t]he allegedly libelous story concerned the California activities of a California resident,"

25

"impugned the professionalism of an entertainer whose television career was centered in California," drew "from California sources, and the brunt of the harm, in terms both of respondent's emotional distress and the injury to her professional reputation, was suffered in California," the Supreme Court determined that "[j]urisdiction over petitioners is therefore proper in California based on the 'effects' of their Florida conduct in California." *Id.* at 788-89.

"The 'effects test' articulated in *Calder* provides an alternate means of establishing specific personal jurisdiction in intentional tort cases by assessing whether 'the defendant's conduct is aimed at or has an effect in the forum state.'" *Allen v. Addi*, No. 20-cv-1650 (TSC), 2021 WL 4306078, at *11 (D.D.C. Sept. 22, 2021) (quoting *Triple Up v. Youku Tudou Inc.*, 235 F. Supp. 3d 15, 24 (D.D.C. 2017) (RDM)); *see GTE New Media Servs.*, 199 F.3d at 1349 (describing "the 'effects doctrine,' which holds that 'jurisdiction may attach if the defendant's conduct is aimed at or has an effect in the forum state' (quoting *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1321 (9th Cir. 1998))). The D.C. Circuit has explained that "[s]ince *Calder*, the [Supreme] Court has clarified the scope of the 'effects' test" and "explained that the inquiry focuses on the contacts that the defendant creates with the forum state, and not just with the plaintiff." *Paxton*, 138 F.4th at 577 (citing *Walden v. Fiore*, 571 U.S. 277, 287 (2014)); *see also Moore v. Cecil*, 109 F.4th 1352, 1363 (11th Cir. 2024) ("Post-*Calder*, the Supreme Court clarified that a defendant's actions do not create sufficient contacts with the forum state 'simply because he allegedly directed his conduct at [a] plaintiff[] whom he knew had . . . connections' with the forum state." (alterations in original) (quoting *Walden*, 571 U.S. at 289)). Under this framework, "courts usually apply a three-part 'effects test' where specific jurisdiction is based on a defendant's: '(1) intentional actions (2) expressly aimed at the forum state (3) causing harm, the brunt of which is suffered—and which the defendant knows is likely to be suffered—in the

forum state.'" *Alpine Consulting Partners, LLC v. Jacokes*, No. 25-cv-913 (SLS), 2025 WL 2959574, at *5 (D.D.C. Oct. 17, 2025) (quoting *Triple Up*, 235 F. Supp. 3d at 29).

As to the first part of the effects test, defendants have taken multiple, intentional actions over the past two months directed at this District with the apparent goal of trying to interfere with Nuñez's choice to use the assistance, *pro bono*, of plaintiff rather than that of defendants, at a significant fee, to obtain his legal release from Guinean custody. For instance, HGL, through its representative Holt, took an intentional action of calling plaintiff in the District, on March 16, 2026, "stat[ing] that Nuñez needed to stop listening to his attorneys and to go along with Hawkwood Group's plan to depart Guinea" and that plaintiff "should 'stand down' on any further efforts for 24 hours" in addition to "negatively comment[ing] about leadership listed on the Global Reach website." Ramsey Decl. ¶ 35; *see also* Pl.'s MTD Opp'n at 7 ("The Hawkwood representative also made statements that threatened Mr. Nuñez. The representative claimed that that Hawkwood Group had information that Mr. Nuñez was complicit in the alleged theft of the Gulfstream, while Mr. Schlenker was just gullible. . . . The conversation ended with the Hawkwood Representative stating Global Reach should 'stand down' on any further effort for 24 hours, followed by a string of negative comments about Global Reach's leadership."). Then another agent of HGL, Kent, took several intentional actions, expressly aimed at an official audience in Washington, D.C., with the principal effects being felt within Washington, D.C. in the form of impugning plaintiff's reputation and interfering with plaintiff's engagement with Nuñez's fiancée by frustrating efforts to obtain the release Nuñez from Guinea and further extending Nuñez's detention with the concomitant consequence of increasing the costs of that engagement to plaintiff in D.C.

27

Kent, for example, on March 26, 2026, sent a threatening text message to Nuñez in Guinea warning him that defendants were "working with the Embassy and the FAA" and were "also going to contact the DEA, because we were able to implicate the plane in trafficking operations all over Mexico, South, and Central." Kent Mar. 26, 2026, Text Message; *see* Compl. ¶ 74. To emphasize this was intended to implicate Nuñez is such illegal operations and scuttle future pilot opportunities with airlines, Kent concludes stating, "And just to be a dick, Im [sic] going to send all my all of my [sic] reports to Delta." Kent Mar. 26, 2026, Text Message; *see also* Pl.'s MTD Opp'n at 6 ("Kent has repeatedly contacted Mr. Nuñez and used high pressure tactics to pressure Mr. Nuñez to pay and go along with their plan.").

Kent repeated these same allegations about Reis having stolen the aircraft and using it for "high-level drug trafficking through Mexico, Central and South America, with direct links to international cartels," in the letter Kent sent the same day to the Guinea Minister of Justice, which was also copied to the FAA and the U.S. Embassy in Conakry, a component of the U.S. Department of State. *See* Kent Mar. 26, 2026, Letter.[6] Kent requested that Reis "be detained until he has made a total financial contribution of $1,897,750 USD," which included a payment demand of $652,750 USD to "Hawkwood L.LC" [sic]. *Id.* This letter ultimately led to the Guinean prosecutor office appealing the April 3 Guinean Judicial Order in Nuñez and Schlenker's cases and the inability for them to leave the country. *See* Ramsey Decl. ¶ 47. Defendants' intentional actions of directing communications to federal agencies in Washington,

---

[6] Plaintiff correctly asserts that this communication is "not 'government contacts' meriting constitutional protections" and that "[n]o case suggests that Defendants' conduct as alleged—backchannels to the State Department and fraudulent allegations to the FAA—is in the ballpark of the 'government contacts' D.C. courts envision." Pl.'s Reply at 14 n.7. Any allusion to the government-contacts exception cannot be distilled from either of Kent's filings. The D.C. Court of Appeals recently reaffirmed that "the government-contacts exception applies only if the defendant can establish that it would violate the First Amendment to assert personal jurisdiction over the defendant." *N'Jai v. U.S. Dep't of Educ.*, 342 A.3d 1217, 1222 (D.C. 2025). Kent has not, and cannot, make any colorable argument that knowingly stating untruths about Nuñez to government officials constitutes speech protected by the First Amendment.

28

D.C. had an adverse effect on plaintiff's ongoing work on behalf of Nuñez and frustrating the end goal of this business relationship of securing Nuñez's release.

Defendants also directed communications to officials located in Washington, D.C. through the @BradPoa X account, which defendants admit is their "social media activity." *See* Def.'s Am. Opp'n at 1 ("[Plaintiff] attempts to establish personal jurisdiction in the District of Columbia based solely on Defendants' social media activity . . ."). In a series of posts made in rapid succession—colloquially referred to as a "Tweetstorm," Pl.'s Suppl. Mem. at 7—on April 13, 2026, defendants distributed an essay, called an "article" and titled "*The Fight for Brad Schlenker: Corruption, Containment, and a Race Against Time in Guinea*." *See* Apr. 13, 2026, Tweetstorm.[7] Dissemination of this post, with embedded "article," was made by tagging and directly pushing this post to, among other Washington, D.C.-based officials and institutions, the President, the White House, the White House Press Secretary, the Secretary of State, the State Department, and the Director of the FBI, to reach multiple intended recipients in this District. *Id.* Without mentioning Nuñez by name but clearly identifying him as the co-pilot to Schlenker, this article painted the attorneys working on Nuñez's release as corrupt, stating, for example, that "[a] Dominican attorney known as 'Cesar,' representing the co-pilot . . . begins coordinating with Kelton Reis' corrupt local counsel"; that "[a]ttorneys including . . . Jocamey Haba . . . facilitate[e] payments that do not result in resolution"; and that the "co-pilot's attorney, 'Cesar,' is reportedly coordinating with local lawyers," including Haba, "to submit documents that further implicates Schlenker" in an "effort [] aimed at shifting liability and potentially using the aircraft itself as leverage for others' release." Apr. 13, 2026, *Fight for Brad Schlenker*. Not only did

---

[7]    The platform X permits any premium user to "share long form written content on X" by creating, what the platform refers to as "Articles," and "[o]nce published, an Article can be read and shared by anyone on X according to the audience controls [the user has] selected for the Article" or can be designated "[s]ubscriber-only" and monetized. *About Articles*, X, https://help.x.com/en/using-x/articles (last visited May 13, 2026).

defendants' "article" impugn  Nuñez's Dominican attorney, Cesar V. Polanco Reynoso, but also accused Guinean "Military authority" and "Judicial actors" of engaging in various acts of coordinated corruption.  *Id.*  Mr. Reynoso made clear in a letter to plaintiff the same day as this April 13, 2026 tweetstorm that "judicial members identified these public actions and their media impact as the official rationale behind the ongoing appeal process."  Reynoso Letter; *see* Ramsey Decl. ¶ 50.

After the filing of plaintiff's complaint, on April 23, 2026, defendants' tweetstorms only expressed additional disparaging allegations about Nuñez and plaintiff.  On April 24, 2026, the @BradPoa account identified Nuñez by name, as essentially a partner of Reis—thereby cloaking him with the serious international drug trafficking and theft accusations leveled by defendants against Reis—and also referenced plaintiff, posting, "[a]n elite DC consulting firm and a DC law firm have been hired to assist Kelton Reis and Fabio Nunez and stymie our investigation into the stolen plane and the alleged Reis organization links to narcotics cartels.  Why are the DC elite helping an alleged Brazilian narcotics trafficker and a Dominican co-pilot shift the blame to Brad, and use the stolen plane to effectuate their release?"  Apr. 24, 2026, Tweet.  This tweet tagged numerous officials and entities in Washington, D.C., including the White House, the White House Rapid Response Team, the FBI Director, Secretary of State Marco Rubio, the Assistant Secretary of the Air Force, various U.S. Senators, and the United States Attorney for the District of Columbia, perhaps with the ultimate goal of obtaining official U.S. government assistance in obtaining payment from Reis for the plane, using a strategy of impugning both Nuñez and plaintiff but with the effect of hampering plaintiff's efforts to obtain Nuñez's release from Guinea.

On April 28, 2026, defendants used the @BradPoa account to post the article "*The Cost of the Accord: How a Dying American Pilot Became the Inconvenient Ghost in the Machine of Washington's New Mineral Diplomacy*," which repeated allegations about Guinean officials' corruption, using terms such as "judicial hostage-taking," called Nuñez an "adversar[y] of Schlenker, and maligned plaintiff's strategic work for Nuñez, stating that "[b]y insisting the pilots are co-defendants, the D.C. firm effectively tethers the innocent Schlenker to the fate of a crew potentially compromised by a suspected trafficker."  Apr. 28, 2026, *The Cost of the Accord*. Tweets containing this article tagged various Washington, D.C. officials and entities, including the White House, the White House Press Secretary, the State Department, the State Department Spokesperson, the FBI Director, and a U.S. Senator.  *See* Apr. 28, 2026, Tweetstorm.

Kent errs in arguing that these posts on X cannot support a finding of specific personal jurisdiction.  *See* Def.'s Am. Opp'n at 1 (criticizing "social media jurisdiction").[8]  The Eleventh Circuit had occasion to determine the viability of personal jurisdiction in a case involving "tweet-based defamation claims," when Roy Moore, who in 2017 was a candidate for an Alabama U.S. Senate seat, sued the chairman of a political advocacy organization for defamation after that chairman posted four tweets tagging accounts belonging to a national political party, the chairwoman of that party's national committee, and two individual strategists from that political party, both of whom resided outside of Alabama.  *Moore v. Cecil*, 109 F.4th 1352, 1356-57 (11th Cir. 2024) (per curiam).  The tweets were about a "pedophile [who] is running in Alabama," without identifying Moore by name, but seemingly related to reporting done by

---

[8]    Defendants' post-complaint April 24 and April 28, 2026, "Tweetstorms" merely follow the same course of conduct as their April 13 tweets and intentionally target by tagging an overlapping cohort of federal officials and agencies in the District.  Reliance on these post-complaint tweets is not necessary to find sufficient contacts for the exercise of personal jurisdiction but only compound that finding based on defendants' pre-complaint contacts with the District, including the April 13 tweets tagging federal government officials in the District, Kent's letter to the Guinean Minister of Justice which copied the FAA and a component of the U.S. State Department, and Kent's claim that he was working with the FAA.

"multiple news media outlets . . . that several women had come forward accusing Moore of improper conduct with them in the late 1970s and early 1980s when the women were ages 14 to 18." *Id.* The Eleventh Circuit agreed with "the district court in Alabama [] that it lacked personal jurisdiction over the tweet-based claims." *Id.* at 1358.

After canvassing the findings of other federal courts of appeal, the Eleventh Circuit observed that its sister "circuits have uniformly held that in determining whether the allegedly defamatory comments or information was directly aimed at the forum, the court must look to the defendant's focus, purpose, and/or intend in posting the information." *Id.* at 1363 (citing *Young v. New Haven Advocate*, 315 F.3d 256, 262-63 (4th Cir. 2002) ("[A]pplication of *Calder* in the Internet context requires proof that the out-of-state defendant's Internet activity is expressly targeted at or directed to the forum state. . . . '[A] State may, consistent with due process, exercise judicial power over a person outside of the State when that person (1) directs electronic activity into the State, (2) with the manifested intent of engaging in business or other interactions within the State, and (3) that activity creates, in a person within the State, a potential cause of action cognizable in the State's courts.'" (quoting *ALS Scan, Inc v. Digit. Serv. Consultants, Inc.*, 293 F.3d 707, 714 (4th Cir. 2002)); *Johnson v. TheHuffingtonPost.com, Inc.*, 21 F.4th 314, 318 (5th Cir. 2021) ("If the site is passive—it just posts information that people can see—jurisdiction is unavailable, full stop. But if the site interacts with its visitors, sending *and* receiving information from them, we must then apply our usual tests to determine whether the virtual contacts that give rise to the plaintiff's suit arise from the defendant's purposeful targeting of the forum state." (emphasis in original) (citing *Revell v. Lidov*, 317 F.3d 467, 470-76 (5th Cir. 2002)); *Eighteen Seventy, LP v. Jayson*, 32 F.4th 956, 971-72 (10th Cir. 2022) ("In other words, we have centered the express aiming analysis on whether the defendant's allegedly tortious

32

conduct was focused on or directed at the forum state . . . ."); *Shrader v. Biddinger*, 633 F.3d 1235, 1241 (10th Cir. 2011) ("Consistent with the thrust of the *Calder*-derived analysis for specific jurisdiction in the internet context discussed above, in considering what 'more' could create personal jurisdiction for such activities, courts look to indications that a defendant deliberately directed its message at an audience in the forum state and intended harm to the plaintiff occurring primarily or particularly in the forum state."); *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1077 (10th Cir. 2008) ("[U]nder the *Calder* test plaintiffs have invoked, they must establish . . . not only that defendants foresaw (or knew) that the effects of their conduct would be felt in the forum state, but also that defendants undertook *intentional actions that were expressly aimed at that forum state*. . . . [D]efendants here more than foresaw or knew the harm alleged to have befallen forum residents; indeed, they do not dispute that they *intended* to cause the cancellation of plaintiffs' [online] auction, and it is that precise alleged harm that plaintiffs seek to have redressed through this suit." (emphases in original)).

Applying these *Calder*-derived principles to posts made on social media, and reviewing additional precedents, the Eleventh Circuit determined that "where the out-of-state defendant deliberately directs his posting at the plaintiff or at an audience in the forum state, then the 'directly aimed at the forum' prong of the *Calder* effects test is satisfied," but "where there is no evidence that the defendant posted the allegedly defamatory information hoping to reach the forum state or an audience in the forum state specifically, then the *Calder* effects test is not satisfied." *Id.* at 1364 (citing *Herman v. Cataphora, Inc.*, 730 F.3d 460, 465-66 (5th Cir. 2013) (finding no personal jurisdiction in Louisiana over an out-of-state defendant, for statements made in interview physically conducted in California, "the focal point of [defendant]'s own quoted statements are on the contract dispute," "[h]e never mentioned Louisiana explicitly or

implicitly," "[h]e did not refer to specific actions taken in Louisiana," but instead discussed plaintiff's "behavior surrounding the contract dispute, which was litigated in California"); *Johnson v. Griffin*, 85 F.4th 429, 435 (6th Cir. 2023) (finding personal jurisdiction over out-of-state defendant, who "cannot deny that, by tagging VisuWell, she sent these communications directly to the company. And she cannot deny that her follow-up tweets about removing Johnson from the Board amounted to direct communications with the Tennessee company."); *Blessing v. Chandrasekhar*, 988 F.3d 889, 906 (6th Cir. 2021) (finding no personal jurisdiction over out-of-state defendants, where "[t]here is no evidence that the defendants posted the tweets hoping to reach Kentucky specifically as opposed to their Twitter followers generally."); *Tamburo v. Dworkin*, 601 F.3d 693, 706 (7th Cir. 2010) (finding personal jurisdiction over out-of-state defendants "alleged to have published false and defamatory statements about Tamburo, either on their public websites or in blast emails to other proprietors of online dog-pedigree databases," "encouraged [readers] to boycott Tamburo's products," and "urged [readers] to contact and harass him" because "although they acted from points outside the forum state, these defendants specifically aimed their tortious conduct at Tamburo and his business in Illinois with the knowledge that he lived, worked, and would suffer the 'brunt of the injury' there"). In "[a]pplying these principles to Moore's case," the Eleventh Circuit concluded that "[t]here is no evidence that the four tweets in question were directed at Alabama or that Cecil intended to target an Alabama audience as opposed to his followers or a national audience generally." *Id.*

A Sixth Circuit case relied upon by the Eleventh Circuit in *Moore* is particularly instructive here. In *Johnson v. Griffin*, the Sixth Circuit considered whether Tennessee had personal jurisdiction over Kathy Griffin, a California-based comedian who had "sent a series of tweets to her two million Twitter followers asserting that Tennessean Samuel Johnson, the CEO

34

of Tennessee-based VisuWell, had engaged in homophobic conduct" and then "tagged his company" in those tweets, "ask[ing] his employer to 'remove[]' him from the Board of Directors." 85 F.4th 429, 431 (6th Cir. 2023) (first alteration added). Johnson sued Griffin claiming "she tortiously interfered with his employment." *Id.* The Sixth Circuit reversed the district court's dismissal for lack of personal jurisdiction, finding that "Griffin directly communicated with VisuWell in her first tweet and, after that tweet prompted his firing, she followed up directly with VisuWell to urge it to dismiss Johnson from its Board of Directors, all while promising more harassment if the Tennessee company did not bow to her wishes." *Id.* at 434. The appellate court distinguished *Johnson* from an earlier case, also involving a claim against Griffin, who had "posted about an 'incident' involving Kentucky students on a trip to Washington, D.C.," where personal jurisdiction was found to be lacking since Griffin "never took any 'affirmative steps' to communicate with individuals in Kentucky when she tweeted about the student's conduct." *Id.* (discussing *Chandrasekhar*, 988 F.3d at 892-93). The Sixth Circuit concluded that tagging "directly communicated with the company's decisionmakers about firing Johnson" and "create[ed] jurisdiction." *Id.* at 435. Since *Johnson*, the Sixth Circuit has continued to hold that "tagging or direct messaging" may create personal jurisdiction, and in the absence of either, plaintiff must produce other evidence of targeting the forum state. *See Newton v. Kardashian*, No. 24-3966, 2025 WL 3200113, at *2 (6th Cir. Sept. 23, 2025) ("To purposefully avail themselves of the forum, the defendants would have to target Newton. In the social media context, this could be targeting or direct messaging. Defendants did neither." (citing *Chandrasekhar*, 988 F.3d at 905, and *Johnson*, 85 F.4th at 435)).

The reasoning from the Eleventh and Sixth Circuits, when applied to defendants' tweets in this case, highlights that those posts directly targeted officials in Washington, D.C. by tagging

35

them, with the intent of disseminating to those officials accusations of criminal conduct by Ries, in partnership with Nuñez, which accusations, if believed, posed a serious risk of undermining plaintiff's efforts for Nuñez's release. These allegations suffice to show tortious interference with the engagement between plaintiff and Nuñez's fiancée. In short, the April 13 tweetstorm tagging government officials in the District, other communications defendants had with plaintiff on March 16, 2016, and claimed to have with government officials in the District of Columbia, present an appropriate basis upon which the exercise of personal jurisdiction over defendants comports with the District's long-arm statute, D.C. Code § 13-423(a)(1), and the binding precedent in *Calder* and *Paxton*.[9]

### 3. Venue is Proper

Finally, Kent's challenge to venue, *see* Def.'s Opp'n at 2, is easily dispatched. Venue is proper in the District of Columbia because, under 28 U.S.C. § 1391(b)(2), a civil action may be brought in "[a] judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." Here, much of the effects of the tortious conduct manifested in the District of Columbia where plaintiff has incurred more than $94,000 in damages and its engagement with Nuñez's fiancée continues with Nuñez remaining detained in Guinea due to defendants' allegedly tortious actions. In the alternative, 28 U.S.C. § 1391(b)(3) provides that a civil action may be filed "if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action." Since both defendants are subject to specific personal jurisdiction in the District of the District of Columbia on the claim asserted, *see supra* Part III.B, section 1391(b)(3) also suffices to provide for venue in this Court.

---

[9] The other prongs of the District's long-arm statute invoked by plaintiff for exercise of personal jurisdiction need not be addressed.

### C.  Plaintiff Satisfies the Requisite Factors for a TRO

Having rejected each ground put forward by Kent to dismiss the complaint, analysis now turns to plaintiff's TRO motion.  Recall that to show entitlement to a TRO, the movant must show that "(1) 'he is likely to succeed on the merits,' (2) 'he is likely to suffer irreparable harm in the absence of preliminary relief,' (3) 'the balance of equities tips in his favor,' and (4) issuing 'an injunction is in the public interest.'"  *Hanson*, 120 F.4th at 231.  "The 'merits' on which plaintiff must show a likelihood of success encompass not only substantive theories but also establishment of jurisdiction."  *Elec. Priv. Info. Ctr. v. U.S. Dep't of Com.*, 928 F.3d 95, 104 (D.C. Cir. 2019) (alteration adopted) (quoting *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015)); *see also SCPS, LLC v. Law*, 770 F. Supp. 3d 11, 31 (D.D.C. 2025) (PLF) ("[T]he question of whether the Court has personal jurisdiction over the Defendant Claimants is still highly relevant to the parties' emergency motions" because "[t]he first factor a party must show to obtain a preliminary injunction–a likelihood of success on the merits– 'includes demonstrating a likelihood of successfully establishing jurisdiction.'" (quoting *Media Matters for Am. v. Paxton*, 732 F. Supp. 3d 1, 12-13 (D.D.C. 2024) (APM), *aff'd* 138 F.4th 563 (D.C. Cir. 2025)); *id.* ("A party seeking a preliminary injunction therefore must establish a 'substantial likelihood that [the] court has personal jurisdiction' over the defendants." (alteration in original) (quoting *12 Percent Logistics, Inc. v. Unified Carrier Registration Plan Bd.*, 282 F. Supp. 3d 190, 200 (D.D.C. 2017) (APM))); *Khatib v. All. Bankshares Corp.*, 846 F. Supp. 2d 18, 25-26 (D.D.C. 2012) (CKK) ("In any context, '[t]he plaintiff has the burden of establishing a factual basis for the exercise of personal jurisdiction over the defendant.'" (quoting *Zoological Soc'y*, 894 F.2d at 456)).

As already concluded, *see supra* Part III.B, plaintiff has established both subject matter over this action and personal jurisdiction over defendants.  With the jurisdictional issues settled,

next to be considered is plaintiff's likelihood of success as to the substantive claim asserted in the complaint. "To state claims for tortious interference under District of Columbia law, a plaintiff must allege [1] the existence of a contract or business expectancy, [2] the defendant's knowledge of the contract or business expectancy, [3] intentional interference causing the breach of the contract or termination of the business expectancy, and [4] damages." *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1134 (D.C. Cir. 2015). In the face of a *prima facie* sufficient claim of tortious interference with a business relationship, "[i]n the District of Columbia, the defendant bears the burden of establishing legal justification or privilege for the inducement of a breach." *Id.* at 1136-37.

Plaintiff has done more than enough to show a likelihood of success as to each of the four elements for tortious interference. First, the business relationship between plaintiff and Nuñez's fiancée is undisputed and confirmed by Nuñez's own sworn declaration. *See* Nuñez Decl. ¶ 8. Second, the phone call from defendants' representative to plaintiff telling plaintiff to "stand down" highlights that defendants knew about the business relationship. Ramsey Decl. ¶¶ 34-35.

As to the third element of the tortious interference claim, defendants have engaged in conduct that amounts to an intentional interference in plaintiff's business relationship. This conduct by defendants includes: (1) calling plaintiff and telling plaintiff to "stand down," *id.*; (2) pressuring Nuñez, with aggressive and even threatening communications, to adhere to defendants' strategy by paying a $160,000 fee to defendants and $40,000 to Guinean authorities, *see* George Decl. ¶ 11; Ramsey Decl. ¶ 30; (3) verbally abusing and threatening Nuñez in an effort to make him follow defendants' strategy, *see* George Decl. ¶ 17; (4) writing a letter on March 26, 2026, to Guinea's Minister of Justice thereby triggering an appeal with the consequence of protracting Nuñez's detention, *see* Ramsey Decl. ¶ 47; and (5) releasing a series

of tweets accusing Nuñez of using corrupt attorneys with an aim of trying to frame Schlenker and lodging corruption allegations about the Guinean justice system, all of which has protracted Nuñez's detention in Guinea interfering with the contract between plaintiff and Nuñez's fiancée, *see id.* ¶ 48. These actions have led to plaintiff being unable to fulfill its engagement by frustrating Nuñez's release by April 17, in accord with the April 3 Guinean Judicial Order, absent any appeal of that order, and complicating his release by communicating falsehoods tying Nuñez, without any evidence, to alleged criminal activity by Reis. *See* Pl.'s MTD Opp'n at 1 ("Defendants are mounting a press campaign for another detainee, Bradley Schlenker, that has angered the Guinean authorities, falsely defamed Mr. Nuñez, and prompted the authorities to appeal the order that was set to release both of them.").

As to the fourth element for a tortious interference claim, namely, resultant damages, plaintiff has established approximately $94,808.37 in damages as of May 2, 2026, that have accrued due to defendants' conduct by making plaintiff's representatives "take two trips so far to Guinea to ensure the safety and well-being of Mr. Nuñez that it otherwise would not have taken absent Defendants' threatening statements to Mr. Nuñez and interference in Global Reach's efforts to secure Mr. Nuñez's release." Second Ramsey Decl. ¶ 3; *see id.* ¶ 11 tbls.1, 2. Additionally, "[a]bsent Defendants' interference, Mr. Nuñez would have been released from Guinea after April 17, 2026," so "[a]ll of Global Reach's time, expenses, and efforts to secure [Nuñez's] release after April 17, 2026, are a direct result of Defendants' actions." *Id.* ¶ 11. Plaintiff estimates "**at least $50,000** in more time and expenses." *Id.* ¶ 12 (emphasis in original).

Moreover, defendants have failed to raise, and the factual record otherwise does not make apparent, any legal justification or privilege to induce defendants' conduct in interfering with plaintiff's engagement. *See Raskauskas v. Temple Realty Co.*, 589 A.2d 17, 27 (D.C. 1991) (in

tortious interference claims, "a defendant is privileged if he acts in order to protect 'a present, existing economic interest.'" (quoting *Dresser v. Sunderland Apartments Tenants Ass'n*, 465 A.2d 835, 839 n.12 (D.C. 1983) (per curiam))).  Kent asserts generally that Nuñez and Schlenker "have adverse opposing legal and strategic interests," Def.'s Opp'n at 3, without any further explanation about how their interests are adverse nor, even if they were, how any misaligned interests justify making false statements about Nuñez, *see supra* n.2, or how pressuring Nuñez to join in defendants' strategy for Schlenker protects an *existing* economic interest of defendants, as opposed to gaining defendants a new client upon payment of $200,000.

Similarly, Kent's *pro se* filings refer to defendants' unnamed client's interest in recovering payment for the plane, suggesting that plaintiff "cannot claim 'irreparable harm' to a 'legitimate mission' when that mission involves an aircraft that lacks a valid airworthiness or registration certificate." Def.'s Am. Opp'n at 2.  The disputed plane ownership issue defendants are pursuing in Guinea on behalf of an unnamed client provides no privilege or excuse for false public assertions that Nuñez is either involved with Reis in some manner beyond being hired as a co-pilot for this doomed flight, or is trying, somehow, to frame Schlenker.  Accordingly, no defense that would justify the interference is even suggested by the current record.

Under the second factor for a TRO, to show irreparable harm, plaintiff must establish that the alleged injury is "'both certain and great,' 'actual and not theoretical,' 'beyond remediation,' and 'of such *imminence* that there is a clear and present need for equitable relief." *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (emphasis in original) (quoting *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (D.C. Cir. 2006)).  This showing requires "proof indicating that the harm is certain to occur in the near future." *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam).  Plaintiff satisfies this second factor by

demonstrating a substantial likelihood that defendants' conduct resulted in an appeal being filed in Nuñez's case before April 17, 2026, and thus his detention being unnecessarily extended. Courts have been clear the "[d]eprivation of physical liberty by detention constitutes irreparable harm." *Arevalo v. Hennessy*, 882 F.3d 763, 767 (9th Cir. 2018) (citing *Hernandez v. Sessions*, 872 F.3d 976, 994 (9th Cir. 2017)); *see also Aracely v. Nielsen*, 319 F. Supp. 3d 110, 155 (D.D.C. 2018) (RC) ("Courts in this and other jurisdictions have found that deprivations of physical liberty of the type suffered by Plaintiffs are the sort of actual and imminent injuries that constitute irreparable harm."). Accordingly, in the absence of injunctive relief, defendants would be free to continue to worsen the circumstances surrounding Nuñez's detention, further prolonging his detention and perpetuating the irreparable harm he has been suffering since December 30, 2025.

Under the third factor, "[t]he balance of the equities weighs the harm to [plaintiff] if there is no injunction against the harm to [defendants] if there is." *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016). In the absence of an injunction, plaintiff has established a likelihood that defendants' continuing counterproductive and disparaging statements about Nuñez, without any apparent basis in truth or facts, will persist and thereby continue to interfere with plaintiff's business relationship with Nuñez's fiancée by protracting Nuñez's detention abroad. Additionally, plaintiff has "demonstrated that the balance of the equities tips in [its] favor because a preliminary injunction will 'not substantially injure other interested parties.'" *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (quoting *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297). In other words, precluding defendants from tortiously creating and disseminating untruthful statements about plaintiff and Nuñez cannot and does not represent a substantial injury for defendants.

Finally, under the fourth factor, plaintiff has established that the public interest favors the facilitation of the return of American citizens wrongfully detained overseas and that "[a]n injunction would thus serve the public interest by removing a tortfeasing impediment to Nuñez's ability to return safely with Global Reach's assistance."  Pl.'s Statement of P. & A. in Supp. of Its Mot. for TRO at 31, ECF No. 2-1.  Plaintiff has thus established a substantial likelihood of succeeding on all four factors necessary for entitlement to a temporary restraining order.

### D.        Temporary Restraining Order

In issuing any injunction order that is enforceable, this Court is mindful of the D.C. Circuit's instruction "[b]efore one may be punished for contempt for violating a court order, the terms of such order should be clear and specific, and leave no doubt or uncertainty in the minds of those to whom it is addressed."  *In re Trump*, 172 F.4th 44, 56 (D.C. Cir. 2026) (quoting *In re Brown*, 454 F.2d 999, 1008 n.49 (D.C. Cir. 1971)); *see also id.* ("A clear and specific order is an essential prerequisite to criminal contempt.").   "These limitations reflect the 'fundamental principle that no citizen should be . . . subjected to punishment that is not clearly prescribed.'" *Id.* (quoting *United States v. Santos*, 553 U.S. 507, 514 (2008) (plurality opinion)).

After the TRO hearing, plaintiff submitted a revised proposed order, which is more specific than the original proposed order by: (1) expressly naming Kent, in addition to HGL and its agents and representatives; (2) specifying that plaintiff's contract is with Nuñez's fiancée with the purpose "to procure the prompt, safe, and legal return to the United States of Nuñez;" (3) ensuring the injunction bars defendant from making certain statements about plaintiff as well as Nuñez, which was omitted from the original proposed order; and (4) removing defendants' attorneys from the scope of the proposed injunction and clarifying that "nothing in this Order shall prevent or limit a person who is counsel of record from defending either Nuñez or

42

Schlenker in a legal proceeding." Pl.'s Suppl. Mem., Att. 9, Revised Proposed Order at 2, ECF No. 18-9; *cf.* Pl.'s Mot., Att. 21, Proposed Order, ECF No. 2-21.

The revised proposed order still contains certain shortcomings. For instance, the proposed order indicates "[t]his order shall remain in effect until the Court hears the case for a Preliminary Injunction and rules upon it, or until further order of this Court." Revised Proposed Order at 2. This term conflicts with Federal Rule of Civil Procedure 65(b), which requires that a TRO "expires at the time after entry—not to exceed 14 days—that the court sets, unless before that time the court, for good cause, extends it for a like period or the adverse party consents to a longer extension." The proposed order also does not enjoin defendants from discussing or making disparaging allegations or accusations about plaintiff or Nuñez in manner that identifies them by means other than their names, by referring to them indirectly or obliquely as they have in past public statements as the "co-pilot" or "elite DC consulting firm." *See, e.g.*, Apr. 24, 2026, Tweet (accusing "elite DC consulting firm and a DC law firm" of being "hired to assist Kelton Reis and Fabio Nunez and stymie our investigation into the stolen plane and the alleged Reis organization links to narcotics cartels. Why are the DC elite helping an alleged Brazilian narcotics trafficker and a Dominican co-pilot shift blame to Brad, and use the stolen plane to effectuate their release?"). These shortcomings are addressed in the TRO that will be issued.

## IV.    CONCLUSION

For the foregoing reasons, plaintiff's motion for a temporary restraining order is **GRANTED** and defendant Kent's motion to dismiss is **DENIED**. An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date:  May 13, 2026

_____
**BERYL A. HOWELL**
United States District Judge