**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

GLOBAL REACH, INC.,

P.O. Box 66625
Washington, D.C. 20035

FABIO NICOLAS ESPINAL NUÑEZ,

Plaintiffs,

vs.

HAWKWOOD GROUP LLC,

7805 Mesquite Bend Dr.
Irving, TX 75063

and ROBERT KENT,

10 Dove Trail
Candler, NC 28715,

Defendants.

Civil Case No. 1:26-cv-01394

**JURY TRIAL DEMANDED**

**[PROPOSED] AMENDED COMPLAINT**

Plaintiffs Global Reach, Inc. ("Global Reach") and Fabio Nicolas Espinal Nuñez ("Nuñez"), by and through their attorneys, for their Complaint against Defendants Hawkwood Group LLC ("Hawkwood Group") and Robert Kent ("Kent"), allege as follows:

**NATURE OF THE ACTION**

1. Nuñez was wrongfully detained abroad in the Republic of Guinea ("Guinea"). His family reached out to Global Reach, a Washington, D.C.-based nonprofit organization dedicated to bringing home Americans who are wrongly held abroad, whether by terrorist groups, criminal gangs, or foreign governments. But Defendants took numerous wrongful actions that made Nuñez's repatriation more difficult and caused the unnecessary extension of his wrongful detention. Doing so interfered with Global Reach's relationship with its client, Nuñez's fiancé. It

also led Nuñez to remain under arrest for longer in Conakry, Guinea, thereby inflicting emotional distress on Nuñez.

2. Global Reach represents and works on behalf of the families of victims wrongly held abroad, at their own choice and at no cost to the families. Global Reach has done this with significant success in the past, working with a mix of families, high ranking government officials, and locals. In the past 10 years, the officers of Global Reach have worked on 124 cases of wrongfully held prisoners worldwide and 78 of those individuals are now safely home with their families. Global Reach brings together professionals with a wide range of experience in the collective effort to bring home wrongly detained Americans. Its staff of international experts includes a former senior F.B.I. official as well as a former leader of the Carter Center.

3. Every one of Global Reach's cases is different, and the role Global Reach plays varies based on need. Cases sometimes go on for years, crossing presidential administrations. Sometimes Global Reach is limited to working to support the family and helping them craft and execute advocacy strategies. In other cases, Global Reach engages directly with the detaining party, either to determine what they want or to effect the deal itself. Each case involves an innocent person in a bad situation and a family in need of help to bring that person home safely. Despite the complex and sensitive nature of these cases, Global Reach has achieved significant success in supporting families and bringing Americans safely home.

4. As a nonprofit organization, Global Reach does not accept money or any form of donation from the victims or the families it serves. Global Reach's sole mission is to bring people home.

5. This work is heavily dependent on Global Reach's sterling reputation, integrity, and expertise in (often quietly) navigating some of the most delicate geopolitical situations on the planet.

6. Unlike non-profit Plaintiff Global Reach, Defendants Hawkwood Group and its representative, Kent, run a for profit business charging fees to the families of wrongfully detained Americans. Hawkwood Group's business model depends on revenue generation, which includes marketing and recruiting clients, including by disparaging Global Reach and its clients.

7. Between March and May 2026, Defendants took active and intentional steps to interfere with Global Reach's efforts to secure the release of U.S. pilot, Nuñez, then detained in the Guinea from December 2025 through June 2026 whose family is represented by Global Reach.

8. Nuñez was detained, involuntarily and wrongfully separated from his family and loved ones in a foreign country, facing difficult conditions, while Global Reach worked diligently to try to bring him home.

9. At every turn, however, Defendants interfered with Global Reach's efforts to secure Nuñez's safe return, spreading false information about Global Reach and Nuñez, engaging in bad acts and threatening tactics, and taking steps that actually prolonged the detention of Nuñez, thereby frustrating Global Reach's efforts to achieve its mission for Nuñez and causing Nuñez severe emotional distress while he remained detained and now, all because Nuñez turned them down to work with Global Reach, and Defendants wanted to pocket a hefty sum for "work" they claimed would secure the release of Nuñez's colleague, another wrongfully detained pilot, Bradley Scott Schlenker ("Schlenker"), a client of Hawkwood Group during the relevant time.

10. On or about March 26, 2026, Kent sent a text message to Nuñez threatening to harm his future employment prospects and go to the Drug Enforcement Administration ("DEA") with a false report, stating: "Next time you talk with your wife, let her know that I am working with the Embassy and the FAA. I am also going to contact the DEA, because we were able to implicate the plane in trafficking operations all over Mexico, South, and Central. And just to be a dick, Im [sic] going to send all my all of my [sic] reports to Delta."

11. On April 7, 2026, Nuñez's attorney received notice that on April 3, 2026, the Brazilian national, Kelton Mendonca Gama Reis ("Reis")—who hired the two pilots and was a passenger on the aircraft—and the two pilots, Nuñez and Schlenker, were approved to leave the country while their trial continued after a ten working-day period passed allowing for any appeals. If no appeals were filed, Nuñez would have been permitted to lawfully depart Guinea after the ten working-day period ended on April 17, 2026.

12. In a letter dated March 26, 2026, Kent wrote to Guinea's Minister of Justice, copying the Embassy and the Federal Aviation Administration, requesting Reis be detained until Hawkwood Group and Schlenker are compensated. On April 7, Kent's March 26 letter was filed with the Guinean courts. As a result of the submission to the appeals court, the prosecutor in the Guinean proceedings involving Nuñez and Schlenker filed an appeal in the proceedings on April 10, 2026, to prevent the departure of all three individuals facing the charges—Nuñez, Schlenker, and Reis. Around the same time, Schlenker, on information and belief at Defendants' direction and control or Defendants themselves acting through Schlenker's account as indicated by his posts written in the third person under handle "@BradPoa", increased his press outreach, making false claims regarding Nuñez and criticizing the Guinean government and justice system. A social media post by the Guinean President appeared to respond directly to these criticisms, and the Guinean government's goodwill toward expediting the case has diminished.

13. Defendants' social media activity only continued from there through the @BradPoa X account which they controlled. In a series of posts in April 2026, Defendants made false and damaging claims about Nuñez and tagged multiple Washington, D.C.-based officials and institutions.

14. As a result of Defendants' actions and spread of false information, Global Reach had to expend significant additional time and resources to try to bring Nuñez safely home to resume

his life and has suffered reputational damage while Nuñez suffered severe emotional distress from Defendants' threats, his prolonged detention as a result of their actions, and the spread of false information about him.

15. Despite their failed efforts, Defendants did not retreat and continued to engage in tactics that directly interfered with Global Reach's work and harmed Nuñez's prospects of being released and caused additional extreme emotional distress. Defendants' tactics have no lawful or moral bounds, and it is unclear what they will attempt next and how it will further worsen the situation for Global Reach, Nuñez, or Global Reach's current and future clients.

## PARTIES

### Plaintiffs

16. Plaintiff Global Reach, Inc. is a Delaware nonprofit corporation based in Washington, D.C., dedicated to bringing home Americans who are wrongly held abroad whether by terrorist groups, criminal gangs, or foreign governments.

17. Plaintiff Fabio Nicolas Espinal Nuñez, age 34, is a dual citizen of the United States and Dominican Republic, and a resident of Ewing, New Jersey.

### Defendants

18. Defendant Hawkwood Group LLC is a Texas for-profit limited liability company that purports to conduct investigative operations and advertises personnel recovery, kidnap and ransom negotiations, recovery from unlawful state detention, and U.S. government contractor, among other services.

19. According to publicly accessible State of Texas records, Hawkwood Group's license to perform private investigation and guard services in Texas, license number C24085901, expired on August 31, 2025, and its insurance policy expired on October 13, 2025.

20. Hawkwood Group is a debtor in four federal tax liens filed in Denton County, Texas, between December 2024 and November 2025 with a total unpaid balance of over $560,000. Hawkwood Group is also cited as a debtor in two active Uniform Commercial Code secured financing statements filed in Texas in September 2023 and January 2024. Hawkwood Group is named as a defendant in *Baldridge v. Hawkwood Group, LLC and Rolando Lopez*, No. 25-13289-431, filed in the District Court of Denton County, Texas on December 29, 2025, in which the plaintiff, a former client of Hawkwood Group, sued the defendants for, among others, breach of contract, fraudulent representation, theft, and unjust enrichment.

21. Defendant Robert "Bob" Kent, age 58, resident of Candler, North Carolina, is no stranger to allegations of extortion in relation to his work. In 2021 it was widely reported that Kent was implicated in an extortion attempt against Matt Gaetz.[1] He has described himself publicly as a "research consultant" with business interests in the Middle East. He has represented himself as being with the Hawkwood Group in relation to this matter, and he has provided documents on Hawkwood Group letterhead listing him as an "authorized representative." Kent is also a "frontier market consultant" for D.C.-based security intelligence firm, Shockley Enterprise & Government Services (SEGSCO).

22. Kent claimed in 2021 to have resources on the ground in Iran to rescue former FBI agent Robert Levinson, who had been taken hostage in March 2007 and was the longest-held U.S. hostage in history. Upon information and belief, Kent's claims concerning this matter were completely unfounded and part of an ongoing effort by Kent to profit from the high-profile and

[1] *See, e.g.*, "Key figure in Gaetz extortion claims responds," Chris Cuomo interview of Bob Kent, CNN (Apr. 6, 2021) (showing Kent admitting that he was cooperating with an FBI investigation into the extortion of Mr. Gaetz's family and admitting, at 2:25, that he contacted Mr. Gaetz's father and sought $25 million in exchange for "a plan that can make [Matt Gaetz's] future legal and political problems go away.") (available at https://www.cnn.com/videos/politics/2021/04/06/bob-kent-matt-gaetz-allegations-respond-sot-cpt-vpx.cnn) (last visited Apr. 21, 2026).

tragic events that befell Robert Levinson. Kent's criminal history includes misdemeanor trespassing charges from 2013 and related contempt charges for failure to appear. Kent has been cited as a debtor in four matters filed in New York and North Carolina since the 1990s totaling over $47,000.

**Relevant Non-Party**

23. Rolando Rufino Lopez Escobar ("Lopez") is the founder, President, CEO, and managing member of Hawkwood Group. Lopez previously served as a special agent in the F.B.I. from 1990 to 2004. Lopez founded Hawkwood Group in 2019 after working in a variety of private sector security roles. Along with Hawkwood Group, Lopez is a debtor in four federal tax liens filed in Denton County, Texas between December 2024 and November 2025 with a total unpaid balance of over $560,000. Along with Hawkwood Group, Lopez is also cited as a debtor in two active Uniform Commercial Code secured financing statements filed in Texas in September 2023 and January 2024. Lopez is named as a defendant in *Baldridge v. Hawkwood Group, LLC and Rolando Lopez*, No. 25-13289-431, filed in the District Court of Denton County, Texas on December 29, 2025 in which the plaintiff, a former client of Hawkwood Group, sued the defendants for, among others, breach of contract, fraudulent representation, theft, and unjust enrichment.

## JURISDICTION AND VENUE

24. This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332(a)(1). Global Reach is, and at all relevant times was, a nonprofit corporation organized under the laws of Delaware with its principal place of business in Washington, D.C. Nuñez is a resident of Ewing, New Jersey. Defendant Hawkwood Group is, and at all relevant times was, a limited liability company organized under the law of Texas with its principal place of business in Irving, Texas. Upon information and belief, Defendant Hawkwood Group's member(s) reside in

and are citizens of the state of Texas. Defendant Kent is, and at all relevant times was, a citizen of the state of North Carolina. The amount in controversy exceeds $75,000, exclusive of interest and costs.

25. This Court has personal jurisdiction over Defendants pursuant to D.C. Code § 13-423(a)(4) because Defendants caused tortious injury in the District by acts occurring outside the District, while regularly engaging in a persistent course of conduct in the District. The exercise of personal jurisdiction is also authorized pursuant to the U.S. Constitution. As described below, the tortious interference alleged herein shows that it was directed towards the District as part of Defendants' concerted efforts to harm Global Reach as their competitor, causing Global Reach harm in the District of Columbia. Defendants aimed their threats, attempts to prolong Nuñez's detention, and the spread of false information regarding Nuñez to the District and caused Nuñez severe emotional distress.

26. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c) because Defendants are subject to personal jurisdiction in this District, a substantial portion of the events and the harm to Plaintiffs giving rise to this Complaint occurred in this District, and Global Reach's principal place of business is in this District.

## I. FACTUAL BACKGROUND

### Two U.S. Pilots Are Wrongfully Detained in Guinea

27. On December 30, 2025, two U.S. citizens and private pilots, Nuñez and Schlenker, were detained in Conakry, capital of the Republic of Guinea, after landing there to refuel on the way to Dubai.

28. Schlenker, age 63, is a resident of Chicago, Illinois.

29. Nuñez and Schlenker were piloting a privately owned Gulfstream IV aircraft carrying Reis and his family.

30. Both pilots and all passengers of the aircraft were arrested after landing in Guinea pursuant to charges that they did not have proper landing permits. The pilots, however, had an approved flight plan.

31. On March 14, 2026, the pilots were released from prison on bail and placed under a form of home confinement at a hotel in Conakry. The pilots were not permitted to safely and lawfully depart Guinea and remained under an exit ban from Guinea until June 2026.

**Global Reach Is Engaged to Assist Nuñez**

32. The families of Nuñez and Schlenker initially retained the legal services of Guinean attorney Jean-Baptiste Jocamey Haba ("Haba") as local defense counsel for both Nuñez and Schlenker on or about January 4, 2026.

33. Global Reach was initially contacted by Schlenker's family for assistance via Global Reach's website on or about February 18, 2026.

34. Global Reach conducted multiple screening intake calls with the Schlenker family, including Schlenker's four siblings.

35. On or about March 2, 2026, Global Reach was advised that Schlenker's brother had hired a private firm instead of Global Reach to secure the release of Schlenker. Hawkwood Group was the private firm hired by the Schlenker family.

36. Unlike Defendants, once Global Reach learned that Schlenker hired another firm, Global Reach limited and then ultimately ceased communications with Schlenker's family as of March 11, 2026, and took no steps to interfere with Defendants' work on behalf of Schlenker or to persuade Schlenker's family to hire Global Reach.

37. On March 10, 2026, Global Reach was contacted by Nuñez's sister via Global Reach's website requesting Global Reach's assistance on the same matter, specific to Nuñez.

38. Global Reach held multiple screening intake calls with Nuñez's sister and was further introduced to other attorneys assisting Nuñez and his fiancé.

39. Following Nuñez's release on March 14, 2026, from prison, Nuñez was immediately placed in contact with Global Reach via his sister.

40. Nuñez reiterated his concerns about the private firm hired by the Schlenker family, Hawkwood Group, and his desire to depart Guinea lawfully and safely without putting his future ability to travel internationally or his pilot's license at risk.

41. On the same date, March 14, Global Reach contacted the U.S. Embassy which provided political and situational context regarding the matter.

42. Global Reach continued to speak to the U.S. Embassy over the course of the next two days regarding the effort to allow Nuñez to depart Guinea.

43. After additional deliberation, pursuant to the assessment that Nuñez was wrongfully detained, as well as the fact that Global Reach had experience, capabilities, and contacts which could assist in resolving the matter, on March 16, 2026, Global Reach advised Nuñez's fiancé that it would accept the case, and she would be the recognized client.

44. Nuñez's fiancé agreed, and collaboration between the two parties began immediately.

45. Global Reach had been retained solely by the fiancé of Nuñez and acted only on her behalf and in direct support of Nuñez.

46. Global Reach was in consistent and continuing engagement with Nuñez, his family, the U.S. Embassy-Conakry, the U.S. State Department-Bureau of Consular Affairs, and various U.S. government agency representatives, among others, to safely and lawfully repatriate Nuñez to the United States.

**Defendants Intentionally Interfere with Global Reach's Mission**

***Kent Makes Threatening Statements to Nuñez***

47. Kent, an agent and representative of Hawkwood Group, has made various threatening statements to Nuñez in an effort to interfere with Global Reach's work to safely bring Nuñez home to the United States and to convince Nuñez to work with and pay Hawkwood Group instead. These threatening statements caused Nuñez, who was already in an incredibly difficult situation, additional and extreme emotional distress.

48. On March 16, 2026, after Global Reach formally accepted the case on behalf of its client, Nuñez's fiancé, Nuñez expressed grave concern that Kent from Hawkwood Group was pressuring him directly and through Schlenker to go along with Defendants' plan and efforts to depart Guinea.

49. Later on the same day, Nuñez again contacted the group chat established by his attorney from the Dominican Republic and fiancé with representatives of Global Reach noting that he was with Kent who was asking for a decision immediately as to whether Nuñez would leave the country with Kent and Schlenker.

50. Kent explained to Nuñez during this conversation that this was a situation of corruption with many people trying to benefit.

51. Kent stated that the price for Nuñez's release was originally $1,000,000, which Kent stated he negotiated to $200,000, including Hawkwood Group's $160,000 fee plus $40,000 for the Guineans. Nuñez and his family have never engaged Hawkwood Group or Kent or authorized any private party besides Global Reach and Nuñez's lawyers to negotiate on his behalf.

52. Kent also said that Schlenker's family and Reis had each already paid money and Nuñez should take advantage of the groundwork that had been laid.

53. Kent continued to repeat that Hawkwood Group had secured agreements from senior Guinean government officials to return their passports and allow them to depart the country.

54. Kent further stated that the charges against Nuñez and Schlenker had already been dropped and that they had been detained for this long due to government officials wanting funds from the families.

55. Kent claimed that the following day, Tuesday, March 17, Nuñez and Schlenker would get their passports back and they would be able to depart the country lawfully the following day, Wednesday, March 18.

56. During this period of time, Global Reach advised its client to be open to what was being offered, and once more information was obtained, Global Reach would advise on pros and cons of this course of action. Ultimately, the information provided by Kent to Nuñez was false and Nuñez continued to be wrongfully detained long beyond March 18.

***Hawkwood Group Tells Global Reach to "Stand Down"***

57. On this same date, March 16, Global Reach was contacted by a representative from Hawkwood Group in response to Global Reach's text message to the CEO of Hawkwood Group.

58. During this call, the Hawkwood representative stated that Nuñez needed to stop listening to his attorneys and go along with Defendants' plan and efforts to depart the country.

59. This representative further explained that Schlenker's family contacted Hawkwood Group through an unidentified venture capitalist, and they took on the case because of Schlenker's family connections.

60. This Hawkwood Group representative falsely claimed that Hawkwood Group had information to indicate that Nuñez and Schlenker were complicit in the theft of the aircraft they flew, and specifically that Nuñez was complicit while Schlenker was just gullible.

61. The conversation ended with this Hawkwood Group representative stating Global Reach should "stand down" on any further effort for 24 hours, and with negative comments about the leadership listed on Global Reach's website.

***Kent Tries to Extort Reis's Wife***

62. On March 19, 2026, Nuñez's attorney from the Dominican Republic shared a letter with Nuñez written in Portuguese dated March 19, 2026, that Kent had sent to Reis's wife.

63. The letter attempted to extort funds from the wife and stated that the wife must make an international wire transfer of $1,245,000 for the full restitution of the crew of Nuñez and Schlenker and another international wire transfer of $652,750 for the ground team that facilitated the release of Nuñez and Schlenker.

64. The letter stated that failure to cooperate would result in Kent referring her to the Guinean authorities and the aircraft being reported as stolen to both U.S. and Guinean authorities.

65. The letter also noted that Kent was retained not only by Schlenker's family, but also by the American owners of the aircraft Nuñez and Schlenker piloted to recover and repatriate the aircraft.

66. On March 19, 2026, Global Reach contacted the U.S. Embassy regarding this letter from Kent stating that Nuñez had nothing to do with this letter and had no desire to be implicated in this potential conspiracy. Global Reach asked for a recommendation for another accommodation that could be made for Nuñez's benefit out of a concern that Nuñez staying near Schlenker would invite further access and threats by Hawkwood Group and Kent against Nuñez.

67. After Nuñez switched locations, Kent took a more threatening tone in communications with Nuñez, including text messages Kent sent to Nuñez on March 22, 2026, stating: "I can't believe you are trusting a corrupt Guinean attorney over a decorated US Military Officer. You are an idiot."

***Defendants Spead False Information About Global Reach's Work and Efforts to Secure Nuñez's Release***

68. On March 23, 2026, another document was sent to Nuñez's Dominican attorney from Kent entitled "Jocamey Avocats." The document purports to outline the background of the Guinean attorney Haba and his firm, Jocamey Avocats.

69. The "Jocamey Avocats" document raises issues with Haba's reputation, claiming his reputation is controversial, and falsely suggests reasons why Global Reach coordinates with Haba.

70. The document also falsely claims that "[b]y working with Haba, Global Reach may be unwittingly **subsidizing the corruption** that is keeping the pilots in jail. Haba has a financial interest in making the 'negotiation' last as long as possible, while Global Reach's presence makes it look like a high-level diplomatic effort is underway, which justifies the delay." (emphasis in original).

71. Contrary to these false claims made to Nuñez, Global Reach did not work with or coordinate with Haba and did everything in its power to obtain Nuñez's release from his unlawful detention.

72. Global Reach contacted Haba on or about February 25, 2026, to conduct initial due diligence after being contacted by the Schlenker family. The intent of the limited communications between Global Reach and Haba was for Global Reach to better understand the status of the legal case and what impediments might exist to its resolution.

73. Upon release of Nuñez from prison on March 14, Global Reach reached out to Haba to ask in French for clarification of the terms of release given Nuñez does not speak French and Haba's English is limited. On March 20, 2026, Global Reach reached out to Haba to inquire in French about the requirement that Nuñez notify the authorities when he changes locations. Haba did not respond. No further contact with Haba has occurred since that March 20 communication.

74. Global Reach did not coordinate any specific actions with Haba in its effort to help secure Nuñez's release, contrary to the false claims made in the "Jocamey Avocats" document.

***Kent Threatens to Report Nuñez to the DEA and to Harm Future Employment Prospects***

75. On or about March 26, 2026, Kent sent a text message to Nuñez stating that there "is only one way out for you" and Reis, and that Reis "has my terms if he changes his mind."

76. In the same discussion, Kent threatened Nuñez's future in order to pressure Nuñez to support payments to Hawkwood Group. Kent specifically threatened to go to the DEA with a false report, stating: "Next time you talk with your wife, let her know that I am working with the Embassy and the FAA. I am also going to contact the DEA, because we were able to implicate the plane in trafficking operations all over Mexico, South, and Central. And just to be a dick, Im [sic] going to send all my all of my [sic] reports to Delta."

77. Among other things, Kent well knew that Nuñez had simply responded to an online solicitation for the trip to Dubai, and it was the first time he had ever piloted the plane involved in this incident.

***Defendants Take Actions That Directly Prolong Nuñez's Detention in Guinea***

78. On April 7, 2026, Nuñez's attorney received notice that on April 3, 2026, Reis, Nuñez, and Schlenker were approved to leave the country while their trial continued after a ten working-day period passed allowing for any appeals. If no appeals were filed, Nuñez would be permitted to lawfully depart Guinea after the ten working-day period ended on April 17, 2026.

79. In a letter dated March 26, 2026, Kent wrote to Guinea's Minister of Justice requesting Reis be detained for stealing the plane on which they flew, along with restitution, including an amount to be paid to Hawkwood Group for management of the crisis and legal costs. Hawkwood Group's efforts to advocate for the detention of individuals (who declined to pay

Hawkwood Group as Defendants requested) in the same matter causing the unlawful detention of Nuñez interfered with Global Reach's efforts to secure his return.

80. The name in the signature block of the letter was Robert Kent "Authorized Representative (Proxyholder)."

81. The letter also stated that Kent is the authorized legal representative of the U.S. lawful owners of the aircraft.

82. On April 7, 2026, Kent's March 26 letter was filed with the Guinean courts, triggering an appeal.

83. Around the same time, Defendants, through Schlenker, increased their press outreach, making false claims regarding Nuñez and directly causing his prolonged detention in Guinea.

84. In a post on X (formerly Twitter) dated April 8, 2026, entitled "The Conakry Trap: Corporate Narcos, a Stolen Gulfstream, and the Betrayal of an American Pilot," Defendants made the false claim that "co-pilot Fabio Espinal Nuñez is reportedly working in coordination with the Reis family and their local attorneys—including the controversial Maître Abdourahamane Dabo and Maître Jean-Baptiste Jocamey Haba—to frame Schlenker for the 'unauthorized' flight, effectively making him the fall guy for the international theft."

85. Defendants' post was written in the third person under handle "@BradPoa" shortly after Schlenker purportedly joined X in early April 2026 under that account name. Upon information and belief, the posts on the "@BradPoa" account were all authored by Defendants.

86. Before this post, Global Reach was making progress in securing Nuñez's release by April 17, 2026.

87. On April 10, 2026, the prosecutor in the Guinean proceedings involving Nuñez and Schlenker filed an appeal in the proceedings to prevent the departure of Nuñez and Schlenker.

Nuñez was directly advised by the prosecutor on April 13, 2026, that the recent appeal filed by the prosecutor's office was due, in part, to the recent social media posts made by Defendants which criticized the government and justice system of Guinea.

88. In a letter dated April 13, 2026, Nuñez's attorney from the Dominican Republic informed Global Reach that the judicial authorities had informed Nuñez's attorney that the grounds for the appeal currently under consideration were specifically linked to a series of publications issued by Schlenker via his X (formerly Twitter) account, which were created in early April. The judicial members had identified these public actions and their media impact as the rationale behind the ongoing appeal process.

89. Defendants took steps that directly caused the unnecessary delay of Nuñez's release from Guinea. Defendants' tactics have been unpredictable and outside the bounds of lawful and ethical conduct.

**Defendants Spread False Information About Global Reach and Nuñez in a Series of "Tweetstorms"**

90. On April 13, 2026, Defendants posted an article titled "The Fight for Brad Schlenker: Corruption, Containment, and a Race Against Time in Guinea," that included an allegation that "[a] Dominican attorney known as 'Cesar,' representing the co-pilot, arrives and begins coordinating with Kelton Reis' corrupt local counsel." This post was not only publicly accessible to any user on X, but also "tagged" to multiple Washington, D.C.-based officials and institutions, including the President, the White House, the Secretary of State, the State Department, and the Director of the FBI.

91. On April 24, 2026, the @BradPoa account identified Nuñez by name, as essentially a partner of Reis and also referenced Global Reach, posting, "[a]n elite DC consulting firm and a DC law firm have been hired to assist Kelton Reis and Fabio Nunez and stymie our investigation into the stolen plane and the alleged Reis organization links to narcotics cartels. Why are the DC

elite helping an alleged Brazilian narcotics trafficker and a Dominican co-pilot shift the blame to Brad, and use the stolen plane to effectuate their release?" This post also tagged numerous officials and entities in Washington, D.C., including the White House, the White House Rapid Response Team, the FBI Director, Secretary of State Marco Rubio, the Assistant Secretary of the Air Force, various U.S. Senators, and the United States Attorney for the District of Columbia.

92. On April 28, 2026, Defendants used the @BradPoa account to post the article "The Cost of the Accord: How a Dying American Pilot Became the Inconvenient Ghost in the Machine of Washington's New Mineral Diplomacy," which called Nuñez an "adversar[y] of Schlenker, and criticized Global Reach's strategic work for Nuñez, stating that "[b]y insisting the pilots are co-defendants, the D.C. firm effectively tethers the innocent Schlenker to the fate of a crew potentially compromised by a suspected trafficker." Posts containing this article tagged various Washington, D.C. officials and entities, including the White House, the White House Press Secretary, the State Department, the State Department Spokesperson, the FBI Director, and a U.S. Senator.

**<u>Global Reach's Efforts to Fulfill its Mission and Its Reputation Have Been Damaged</u>**

93. Nuñez's release was materially delayed as a result of Defendants' wrongful conduct and interference with Global Reach's work.

94. Defendants' interference also caused inertia in Nuñez's case and extended his detention in Guinea.

95. Defendants' fearmongering and threats to Nuñez sought to frustrate Global Reach's ability to perform its role for Nuñez and his family and interfered with Global Reach's negotiations with relevant stakeholders.

96. The April 7 letter filed with the Guinean court, including Defendants' March 26 letter to the Minister of Justice, stopped the ten working-day period before Nuñez's scheduled release after April 17, 2026, and the false press spread by Defendants directly caused the

prosecutor in the Guinean proceedings to file an appeal, further delaying Nuñez's safe and lawful exit from Guinea.

97. Global Reach had to help facilitate different accommodations for Nuñez to protect him from the harassment of Defendants.

98. Global Reach also needed to spend additional time and resources due to the fact Nuñez was coping with the stress of Defendants' pressure tactics, including making an emergency trip to Guinea that expended 25% of its time on the ground supporting Nuñez in navigating Kent's pressure tactics and false claims instead of the intended purpose of the trip to support Nuñez's release.

99. Global Reach has been harmed in its mission both for Nuñez and other clients because of the amount of time and resources it has needed to expend to address Defendants' bad acts. This includes actual time spent communicating with Nuñez and addressing concerns generated by Defendants' bad acts, time lost advancing Nuñez's case and the cases of other clients, and multiple emergency trips to Guinea.

100. Defendants' wrongdoing has caused Global Reach's relationship with Nuñez, his fiancé (the client), and his family to be harmed, insofar as Defendants' actions interfered with Global Reach bringing Nuñez home. Doing so is the central premise of the relationship Global Reach has with Nuñez, his fiancé (the client), and his family.

101. Defendants' interference caused Global Reach to expend additional monetary resources to secure Nuñez's release. Including its time, travel costs, and other expenses, the total monetary damage Global Reach suffered because of Defendants' actions is in excess of $75,000 (not including the costs and expenses of this litigation).

102. Global Reach's primary and most valuable business asset is its reputation for expertise and trustworthiness. Global Reach's work to secure the release of unlawfully detained

U.S. persons depends entirely on its good reputation, skill, and the public perception of its credibility and effectiveness with key decision makers.

103. Defendants' actions have harmed Global Reach's reputation by publicly defaming Global Reach to government stakeholders and future negotiating partners.

104. Defendants' actions undercut and diminish Global Reach's valuable asset—its reputation for trustworthiness and effectiveness in achieving its mission on behalf of the families and clients it serves.

**Nuñez Suffered Severe Emotional Distress as a Result of Defendants' Intentional Actions**

105. Nuñez was detained in a foreign country away from his family and loved ones for five months. His detention was prolonged as a direct result of Defendants' bad acts.

106. During those five months, Nuñez suffered significant emotional distress and depression. He worked with a hostage counselor to try to manage his symptoms. He was alone and isolated from the world, afraid for his safety each and every day. He had trouble eating and sleeping and once released from prison, was afraid to leave the places in Guinea where he resided. He had to switch locations to maintain his safety and avoid Defendants. He feared that this nightmare would not end.

107. Nuñez was also severely emotionally distressed by Defendants' direct threats to him and his future employment prospects. All he hoped for was to safely return home to the United States and resume his life with his family and as a pilot. Yet Kent, knowing Nuñez had no connection to the aircraft prior to these events, threatened to falsely report him to the DEA and "just to be a dick," to also send his reports to Delta to harm Nuñez's future employment prospects.

108. While Nuñez was still detained in Guinea in April, as a direct result of Defendants' actions, Defendants began posting numerous falsehoods about Nuñez through the @BradPoa X account, further emotionally distressing Nuñez who at that point could have been safely home but

for Defendants' interference. Not only did Defendants post these falsehoods publicly, but specifically targeted the posts to numerous officials and entities in Washington, D.C.

**COUNT I**
**Tortious Interference with Business Relationships**

109. Plaintiffs repeat and reallege all of the allegations contained in the preceding paragraphs of this Complaint as though the same were fully set forth herein.

110. To make out a prima facie case of tortious inference with a business relationship, a plaintiff must demonstrate (1) existence of a valid contractual or other business relationship; (2) the defendant's knowledge of the relationship; (3) intentional interference with that relationship by the defendant; and (4) resulting damages.

111. Nonprofit charitable work constitutes a business for the purposes of tortious inference with a business relationship.

112. Global Reach has a valid business relationship with Nuñez's fiancé and was retained by her and initially also his sister to help secure Nuñez's release.

113. Defendants are aware of Global Reach's relationship with Nuñez's fiancé, and its efforts to help secure the release of Nuñez, through their discussions with Nuñez directly and their work with the Schlenker family, who originally sought to engage Global Reach.

114. Defendants have intentionally interfered with Global Reach's business relationship with Nuñez's fiancé and its efforts to secure the release of Nuñez by threatening Nuñez, spreading false information about Global Reach, engaging in bad acts and threatening tactics including possible extortion, and taking steps that have damaged its efforts to secure the release of Nuñez and have prolonged his detention, all for Defendants' own benefit.

115. Defendants' actions have caused the prosecutor in the Guinean proceedings to file an appeal, directly prolonging Nuñez's detention in Guinea.

116. Global Reach has suffered damages, including in the form of lost time and resources in achieving its mission to bring Nuñez safely home, delays in Nuñez's secure release, and harm to Global Reach's reputation and charitable work. Some of that damage is irreparable, while other damage is compensable.

**COUNT II**
**Intentional Infliction of Emotional Distress**

117. Plaintiffs repeat and reallege all of the allegations contained in paragraphs 1 through 108 of this Complaint as though the same were fully set forth herein.

118. To make out a prima facie case of intentional infliction of emotional distress, a plaintiff must demonstrate (1) extreme and outrageous conduct on the part of the defendant; (2) which intentionally or recklessly causes; (3) severe emotional distress to the plaintiff.

119. Defendants engaged in extreme and outrageous conduct by directly threatening Nuñez, taking steps that prolonged his detention in Guinea, and making false statements publicly and targeting those statements to numerous government officials and entities.

120. Defendants' conduct was intentional as Kent directly threatened Nuñez via text message, Defendants sent a letter that triggered an appeal further delaying Nuñez's release, and Defendants made numerous false statements through posts they authored on the @BradPoa account.

121. As a result of Defendants' intentional actions, Nuñez suffered severe emotional distress and depression, fearing for his safety due to Defendants' threats, grappling with being detained and isolated in a foreign country away from loved ones and having that detention extended due to Defendants' wrongful actions, and fearing for his personal and professional reputation as he watched his name and involvement be included in falsehoods spread by Defendants far and wide.

## PRAYER FOR RELIEF

122. WHEREFORE, Plaintiffs Global Reach, Inc. and Fabio Nicolas Espinal Nuñez hereby demand a trial by jury on all issues so triable and respectfully requests that this Court enter judgment in their favor and against Defendants Hawkwood Group LLC and Robert Kent, and further requests:

a. That the Court issue a preliminary injunction enjoining Defendants from continuing the acts complained of during the pendency of this action;

b. That the Court issue a permanent injunction prohibiting Defendants from continuing or repeating the tortious interference alleged herein, including interfering with Plaintiff's existing or prospective business relationships by improper means;

c. An award of compensatory damages in an amount to be proven at trial;

d. An award of damages for injury to Global Reach's business reputation, professional standing, and goodwill from Defendants' tortious interference, in an amount to be proven at trial;

e. An award of damages for injury to Nuñez from Defendants' intentional infliction of emotional distress, including punitive damages, in an amount to be proven at trial; and

f. Such other and further legal or equitable relief as the Court deems just and proper.

**BAKER & HOSTETLER LLP**

*/s/ Paul M. Levine* ____________________
Katherine L. McKnight, Bar #994456
Steven M. Dettelbach, Bar #440406
Alexander L. Reid, Bar #497396
Jonathan R. Barr, Bar #437334
Paul M. Levine, Bar # 999320
Caleb B. Acker, Bar #90003291
1050 Connecticut Avenue, Suite 1100
Washington, D.C. 20036
Telephone: 202.861.1500
Facsimile: 202.861.1783
kmcknight@bakerlaw.com
sdettelbach@bakerlaw.com
areid@bakerlaw.com
jbarr@bakerlaw.com
pmlevine@bakerlaw.com
cacker@bakerlaw.com

*Attorneys for Plaintiff Global Reach, Inc.*

DATED: July 17, 2026